# DECISIONS

—— OF THE ——

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, A. D. 1896.

### EX PARTE ED. SENIOR, JR., HABEAS CORPUS.

1. The rule stated in *Ex parte Edwards*, 11 *Fla.* 174, that in the absence of statutory limitations or restrictions, the power of the several courts over contempt is omnipotent, and its exercise is not to be inquired into by any other tribunal, is subject to the qualification that the conduct charged as constituting the contempt must be such that some degree of delinquency or misbehavior can be predicated of it; for if the act be plainly indifferent or meritorious, or if it be only the assertion of an undoubted right of the party, it will not become a criminal contempt by being adjudged to be so.

2. The ancient maxim of the common law, *nemo tenetur se ipsum prodere*, is imbedded in the provision in the twelfth section of the Bill of Rights of our Constitution, that no person shall be compelled in any criminal case to be a witness against himself, and such provision should be broadly and liberally construed to secure the protection designed to be accomplished by it.

3. The purpose of the provision mentioned is to exempt one from being compelled, in any judicial or other proceeding against himself, or upon the trial of issues or investigation of facts between others to disclose facts or circumstances that can be used against him as admissions tending to prove guilt, or connection with any criminal offense, of which he may then or afterwards be charged, or the sources from which, or the

means by which, evidence of its commission, or his connection with it, may be obtained.

4. The right of privilege against disclosure of incriminatory statements or evidence is personal to the witness, he alone being entitled to invoke its protection, and it may be waived by him.

5. While the witness must judge of the effect of his answer, and should not be required to explain how it will criminate him, yet the court must determine, under all the circumstances of the case, whether such will be its tendency from the question asked; and where, from the nature of the investigation and the character of the testimony sought, it reasonably appears that the answer may criminate, or tend to criminate, the witness has the right to claim his privilege, and is not bound to answer.

6. The court should inform a witness of his right of privilege when the circumstances of the case call for it, but when he, with full knowledge of his rights, consents to testify about the very matter that may criminate him, without claiming his privilege, he must submit to a full, legitimate cross-examination in reference thereto.

7. Section 2787, R. S., providing that whoever casts knowingly an illegal vote at an election in this State held according to law shall be punished by imprisonment in the State prison not exceeding six months, or by fine not exceeding one hundred dollars, applies to illegal voting at municipal elections in this State, and a party who votes at such an election is not compelled to testify as to his vote when examined as a witness in a suit involving the validity of the election; but if, with full knowledge of his rights, he consents to testify that he did vote, and his ballot was received by the judges and inspectors of the election, he must submit to a full cross-examination as to his qualifications as a voter.

This is a case of original jurisdiction.

The facts in the case are stated in the opinion of the court.

*Blount & Blount, C. B. Parkhill* and *John Eagan,* for Petitioner.

1. Habeas corpus lies: While the writ will not lie to review the action of the court below when the court had authority to make the order which had been disobeyed or when the thing done was an offense against the law, yet it does lie when upon the admitted facts the court did not have the legal right to make the order, or when in disobeying it the person committed was in the exercise of a constitutional right. People ex rel. Hackley vs. Kelly, 24 N. Y. 74; People vs. Liscomb, 60 N. Y. 559; In matter of Dill, 32 Kansas, 668; Counselman vs. Hitchcock, 142 U. S. 547, 35 Co-op., Ed. 1110, 9 Am. & Eng. Ency. of Law, p. 218.

In such case the court may have jurisdiction of the person and of that offense, but it has no authority to make the particular order complained of. People vs. Liscomb, 60 N. Y. 559; Ex parte Lange, 18 Wall. 163.

2. The witness had a right to refuse to answer. Sec. 12 Declaration of Rights, Const. of Fla.

The authorities are in conflict as to whether a witness who has begun to answer can refuse to answer a question which he thinks will tend to criminate him.

The later English authorities hold that the privilege is one which he may claim at any stage, and even though he has answered other questions about the same matter. Regina vs. Garbet, 2 Car. & Kir. 474, 1 Dennison's Cr. Case 236, and this overrules the earlier English cases.

The late English doctrine is recognized in Foster vs. People, 18 Mich. 266, and affirmed in Counselman vs. Hitchcock; 142 U. S. 547, 35 Co-op. ed. 1110.

Though in the latter case the waiver of the privilege by beginning to testify was pressed by counsel upon

the court.   See brief counsel on page 1111, vol. 35 Co-operative Ed. U. S. Supreme Court Reports.   The reason is with these cases, instead of with the prevailing American doctrine.   That doctrine is for the intellectual man who can distinguish the bearing of each and every question, and not for the unintelligent who, though warned and conscious of his right, can not detect a violation of it in an apparently innocent question, but who is aroused when he comprehends that the right is invaded.

But if the general American doctrine is correct, it has the limitation that the witness who consents to testify to one thing, does not waive his privilege to refuse to testify unless he has already so testified as to furnish conclusive evidence of his guilt. Foster vs. People, 18 Mich. 266.

Or unless the thing inquired about is necessary for an explanation of that which has been testified to before.   Lombard vs. Mayberry, 24 Neb. 674, 40 N. W. Rep. 279; Amherst vs. Hollis, 9 N. H. 107; Coburn vs. O'Dell, 30 N. H. (10 Foster), 540; Taylor vs. McIrvin, 94 Ill. 488; People ex rel. Taylor vs. Forbes, 143 N. Y. 219, 38 N. E. Rep. 303.

Almost all, if not all, of the cases cited to the contrary are cases of accomplices or when the testimony already given was a part of the transaction which was incomplete without the testimony sought.   Here the transaction of voting was a complete thing in itself, and the testimony sought was not to explain it, but to impeach it, and was sought for the sole purpose of showing the witness to be a felon.   Cross-questions trying to show ignorance as to whom he voted for, or any circumstances affecting the reliability of the testimony given; would have been admissible; but not

questions which related to distinct transactions at other times and places, and having no connection with this act. Ex parte Boscowitz, 84 Ala. 463; People vs. Mather, 4 Wend. 229; Amherst vs. Hollis, 9 N. H. 107; People *ex rel.* Hackley vs. Kelly, 24 N. Y. 74; People vs. Sharp, 107 N. Y. 427, 14 N. E. Rep. 319; People *ex rel.* Taylor vs. Forbes, 143 N. Y. 219, 38 N. E. Rep. 303; McFadden vs. Reynolds, (Pa.) 11 Atl. Rep. 638, 10 Cent. Rep. 387; Williams vs. Dickenson, 28 Fla. 90, 9 South. 847; Barber vs. State, 13 Fla. 675; Dedric vs. Hopson, 62 Iowa, 562, 17 N. W. Rep. 772; Pickard vs. Collins, 23 Barbour, 444; Bellinger vs. People, 8 Wend. 595; Mitchell vs. Hinman, 8 Wend. 667.

In Higdon vs. Heard, 14 Ga. 255, it is decided that this privilege can not be waived.

The act of voting is one transaction, entire in itself, and cross-questions with reference to matters existing at the time he voted and where he voted, seeking to test the truthfulness of these statements, should be answered by the witness; but the question of his naturalization, as to where he was born, is an entirely different transaction—a transaction which took place many years ago. The question of the registration of the voter, is an entirely different matter and transaction from his voting, and must have occurred according to the law, months before he voted. The question as to whether he moved from one precinct to another before he voted, and as to where he lived before he voted, are all distinct and separate matters and transactions from the question of his voting. It may be that all these matters entered into his right to vote, but these things were not testified to in the witness' direct examination, and may be shown by other proof by the relator.

I was asked by Mr. Justice Taylor during the argument of this case whether it was a crime not to register in this State. The purpose of that question may have been to ascertain whether the answer to that question propounded to petitioner in the court below would tend to criminate him, and if it would not do so, then he should not refuse to answer it.

Chief Justice Marshal in Burr's trial, to which reference has been made in brief of counsel for petitioner, decided that a witness could refuse to answer any question which would lead up to criminating questions, and not wait to refuse to answer the main question, the answer to which would criminate him. See that interesting opinion in Burr's trial, and this brings us directly to the very point in the case.

When the witness was questioned about his registration or his naturalization, he was questioned about different transactions than his voting. According to the so called American doctrine, if the witness had begun to answer those questions, by saying, for instance, that he was born in England, and then asked if he had ever been naturalized in this country, he could be required to answer this question, but under the decision of Chief Justice Marshall he declined to begin to answer any of these questions, declined to begin to give testimony upon these transactions, and claimed his privilege at the beginning of the examination upon these matters.

There can be no doubt that the fact that he voted is an entirely different transaction from the fact of his qualification to vote or the legality of his vote. Petitioner testified that he voted, that was one complete transaction, upon cross examination he could be asked any question to test the truth of that statement, such as the question, if it was not a fact that he was in Tal-

lahassee and not in Pensacola on the day of the city
election, or if he had not admitted to another person
that he had not voted, even though the answer might
show him guilty of perjury. But that was not the
character of questions asked the witness on cross ex-
amination. The cross examination went into a differ-
ent transaction, even though that transaction was con-
nected with the voting of the witness. The registra-
tion of the witness must have taken place weeks or
months before he voted, and was the same kind of a
different transaction as was the disposition of the
money of Otis, the pauper mentioned in the case of
Amherst vs. Hollis, in 9 New Hampshire, 107.

That is a clear statement of the American doctrine
as announced by the New England courts.

*S. R. Mallory, John S. Beard, C. M. Jones* and
*John C. Avery, contra.*

### BRIEF FOR THE RESPONDENT.

1. Whether this court will review by habeas corpus
an order made by the Circuit Court punishing a per-
son for contempt, it has never decided.

This court has decided that it will not review such
order by appeal or writ of error. Caro vs. Maxwell,
20 Fla. 17.

This court has further held that "in the absence of
any statutory limitation or restriction, the power of
the several courts over the matter of contempt is om-
nipotent, and its exercise in any particular case is not
to be questioned by any other tribunal. It is the great
bulwark established by the common law for the pro-
tection of courts of justice, and for the maintenance of
their dignity, authority and efficiency. Ex Parte Ed-
wards, 11 Fla. 174.

2. It is the province of the court to pass upon the tendency to criminate of the questions which the witness refused to answer.

This rule is not beyond question, but the weight of authority is said to support it. 9 Crim. L. Mag. & Rep. 301, citing; Richmond vs. State, 2 Green. (Ia.) 532; State vs. Duffy, 15 Ia., 425; Commonwealth vs. Braynard, Thack. (Mass.) Cr. Cas. 147; Kirschner vs. State, 9 Wis. 140.

It does not appear that the witness gave to the court any intimation as to how any of the questions not answered would elicit testimony which would incriminate him. He gave no intimation of the danger apprehended. Under such circumstances, certainly, the judgment of the trial judge should prevail. Regina vs. Boyes, 1 El., B. & E. 311; S. C. 9 W. R. 960.

In case the witness had complied with the court's order, after asserting his privilege, the evidence would be regarded as given under compulsion, and could not thereafter be used against him. Thompson on Trials, sec. 310; Regina vs. Garbett, 2 Car. & K. 474.

In the monograph by Stewart Rapalje, above referred to in 9 Cr. Law Mag. & Rep. 302, it is said "the result of a comparison of the adjudications seems to be that the preliminary question, 'can *any* answer, responsive to the question, subject the witness to a criminal prosecution?' must be decided by the court and not by the witness. If the court holds the affirmative of that question, then the witness has a right to decide whether the answer he would give to the question would have such effect." Thompson on Trials, sec. 309; Kirschner vs. State, 9 Wis. 140; People vs. Mather, 4 Wend. (N. Y.) 254.

3. If the petitioner in this case possessed the right to determine the effect of answering the questions, and

refused to testify because he believed his answer would tend to incriminate him, he waived his right.

He was called as a witness to prove a legal vote for Pat. McHugh for Mayor of Pensacola. He was advised in advance by the court as to his privilege. In response to questions propounded by McHugh's counsel he testified that he voted for him. It became material to know whether he was a legal voter so that his vote should count as a valid one with the jury trying the case.

If he was a legal voter, the questions objected to could not criminate him, but would only have the effect of fully fixing the legality of his act. If he was not a legal voter, on account of change of residence, failure to register, failure to secure a registration certificate, being under twenty-one years of age, not being a naturalized citizen, not having resided in the State one year or the county six months, then it was material that the whole truth be known. Otherwise, there would be before the jury, as a legal vote for McHugh, that which in truth was not a legal vote at all. And so the witness by stating a part of the truth with regard to his ballot would enable McHugh to get the benefit of it, by refusing to go further and state other facts affecting his ballot. Thus if there were five hundred illegal ballots cast for a candidate, the fraudulent voters could prove his election by testifying that they voted for him and refusing to testify further and fully to facts fixing the legal quality of the ballots.

If petitioner was an illegal voter and liable to criminal prosecution therefor, his offense would be provable only by evidence (a) that he voted and (b) that he was so circumstanced as not to be entitled to vote. These two elements constitute the offense of casting an illegal ballot, which is one entire thing.

We therefore submit that when petitioner, after being advised of his privilege, as he was by the court, testified to the fact that he had voted for McHugh, he waived his privilege and was compelled to submit to a full cross examination touching facts within his knowledge which would determine the legality or illegality of his vote.

In England it is said that the rule is perhaps different, except that a witness may not *there* use his privilege arbitrarily, to make a partial statement of facts to the prejudice of either party—as this petitioner tried to do. East vs. Chapman, Moo. & M. 47; Austin vs. Poiner, 1 Sim. 348; Dixon vs. Vale, 1 Car. & P. 279.

But the American rule is that if the witness voluntarily discloses a part of a transaction tending to criminate him, he waives his privilege, and must answer freely and disclose the whole. Commonwealth vs. Price, 10 Gray, 472; S. C. 71 Am. Dec. 668, and note; Mayo vs. Mayo, 119 Mass. 292; People vs. Carroll, 3 Pack. (N. Y.) Cr. 83; Brown vs. Brown, 5 Mass. 320; Foster vs. Pierce, 11 Cush. (Mass.) 437; State vs. K——, 4 N. H. 562; 1 Gr. Ev. sec. 451, note; Whart. Cr. Ev. sec. 471; State vs. Foster, 23 N. H. 354; State vs. Nichols, 29 Minn. 357; Commonwealth vs. Pratt, 126 Mass. 463; People vs. Freshour, 55 Cal. 375; Norfolk vs. Gaylord, 28 Conn. 312; Roddy vs. Finnegan, 43 Md. 502; Chamberlein vs. Wilson, 12 Vt. 491; Este vs. Wilshire, 44 Ohio St, 636; Young vs. Young, 5 Redf. (N. Y.) 505; 1 Thompson on Trials, sec. 307.

In a recent work on evidence the rule is thus stated: "If the witness consents to testify in one matter tending to criminate himself, he must testify in all respects relating to the matter so far as material to the issue. If he waives the privilege he does so fully in relation to the act." Bradner on Evidence, sec. 2. And to

## JANUARY TERM, 1896.     11

Ex Parte Ed. Senior, Jr., Habeas Corpus.—Argument of Counsel.

the same effect see monograph by Decius S. Wade. 2 Cr. Law Mag. and Rep, 317.

The rule may be modified in cases where the witness testifies under an innocent mistake, and in such cases the testimony given under such circumstances may be suppressed, as in the case of Mayo.vs. Mayo, supra, or if the court finds that it has improperly forced a witness to answer, the answers may not be used against him, as in Regina vs. Garbett, supra. But few cases are likely to be found in the United States against the general rule, or holding that when the witness, having been put on his guard, states part of a criminal transaction to the advantage of one suitor he is protected in refusing to state the other part which may benefit the adversary party. The court may in a proper case strike out from the evidence the circumstance or fact stated, but will not permit it to stand as the whole truth. Pinkard vs. State, 30 Ga. 757; Dandridge vs. Cordon, 3 C. & P. 11; 14 E. C. L. 185.

It was contended in the Circuit Court that the petitioner, up to the time of his refusal, had only testified to a perfectly legal act. But it was not a legal act unless he was a legal voter. It has been held that in an action to try title to office, a witness can not be compelled to testify whether he voted, when the evidence would tend to criminate him. State vs. Hopkins, 23 Wis. 309.

It was strenuously argued before the Circuit Court that the case of Counselman vs. Nitchcock, 142 U. S. 547, is against our position. An examination of that case demonstrates the contrary.

. (a) The witness was under examination before the grand jury, without the advice of court or counsel as to his right in regard to the preliminary questions lead-

ing up to the main inquiry which he declined to answer.

(b) The questions answered were not such as necessarily tended to criminate the witness.

(c) No claim was made that any answers given constituted a waiver of the witness' privilege.

(d) The court in that case did not consider the question involved in this case.

MABRY, C. J.:

The return of the sheriff to the writ of habeas corpus shows that on the 17th day of February, 1896, pending the trial of a case in *quo warranto* proceedings instituted in the name of the Attorney-General on the relation of William E. Anderson against Pat. McHugh—the issue being whether the said Anderson or McHugh had received the highest number of votes at an election for Mayor of the city of Pensacola held in said city on the 4th day of June, 1895—the petitioner, Ed. Senior, Jr., was called and sworn as a witness for respondent McHugh, and having been advised by the court that he need not testify to any fact tending to convict him of crime, testified, in reply to questions by respondent's counsel, that he voted at said election, in election precinct 13, for Pat. McHugh for Mayor, and that his ballot was received by the inspectors. Thereupon, being turned over to the State for cross-examination, the following questions were propounded to said witness, *viz :*

Where were you living at the time you cast your ballot ?

How long had you been living at that place ?

At what place were you living at the time of the last city election ?

Did you have a certificate of registration?

Where were you born?

Were you born in the United States?

Did you ever take out any naturalization papers?

Are you twenty-one years of age?

How long have you been living in the State of Florida?

How long have you been living in the county of Escambia?

How long have you been living in the city of Pensacola?

Were you ever registered?

Did you take any oath?

Thereupon he refused to answer either of said questions, upon the ground that the answers would tend to criminate him, and the court deciding that the witness should answer the questions, and ordering him to make answers thereto, and still persisting in his refusal, he was adjudged to be in contempt of court, and ordered to pay a fine and stand committed in the custody of the sheriff until the fine was paid. Upon the refusal of the witness to pay the fine, he was taken into custody by the sheriff, and still remaining in custody, has sued out a writ of *habeas corpus* and asks to be discharged.

A suggestion comes *in limine* from counsel opposed to the writ that the court will not review, on *habeas corpus*, an order made by the Circuit Court adjudging a person guilty of contempt. Reference is made to the decision in Caro vs. Maxwell, 20 Fla. 17, holding that a contempt order will not be reviewed on appeal or writ of error, and also to the language used in *Ex parte* Edwards, 11 Fla. 174, "that in the absence of any statutory limitations or restrictions, the power of the several courts over contempt is omnipotent, and its

exercise is not to be enquired into by any other tribunal. This is the great bulwark established by the common law for the protection of courts of justice, and for the maintenance of their dignity, authority and efficiency, and neither in England nor in the United States has this unrestricted power been seriously questioned.'' The first case referred to has no application here, as we have no writ of error or appeal to review an order of a Circuit Court in a contempt matter. The rule announced in the second case is not now questioned, but its application must be confined to proper limits. As a general rule *habeas corpus* does not lie to correct mere irregularities of procedure where there is jurisdiction, and in order to sustain the writ there must be illegality or want of jurisdiction. *Ex parte* Pitts, 35 Fla. 149, 17 South. Rep. 96; *Ex parte* Prince, 27 Fla. 196, 9 South. Rep. 659; *Ex parte* Bowen, 25 Fla. 214, 6 South. Rep. 65. When a person has been taken into custody under an order of a court exercising proper jurisdiction, a *habeas corpus* to discharge the person so taken involves a collateral attack on the order under which he is held, and well established rules forbid an investigation into matters of mere irregularity in procedure. But illegality in matter of law or want of jurisdiction may be inquired into and the decision of the lower 'court, as to such matter, is not conclusive. The following language taken from People *ex rel.* Hackley vs. Kelly, 24 N. Y. 74, a contempt proceeding, is expressive of our view on the subject, *viz:* ''But this rule is of course subject to the qualification, that the conduct charged as constituting the contempt must be such that some degree of delinquency or misbehavior can be predicated of it; for if the act be plainly indifferent or meritorious, or if it be only the assertion of the undoubted right of the party,

it will not become a criminal contempt by being adjudged to be so. The question whether the alleged offender really committed the act charged, will be conclusively determined by the order or judgment of the court; and so with equivocal acts, which may be culpable or innocent according to the circumstances; but where the act is necessarily innocent or justifiable, it would be preposterous to hold it a cause of imprisonment. Hence, if the refusal of Mr. Hackley, the relator, to answer the question propounded to him, was only an assertion of a right secured to every person by the Constitution, it was illegal to commit him for a contempt.'' It can not certainly be true that the decision of an inferior court adjudging a matter to be a contempt precludes all investigation as to the legality or proper authority of the court to make such order; and on the other hand, it must not be forgotten that in such matters when the court is acting within the sphere of its legitimate powers the appellate tribunal will not undertake to review the correctness of conclusions as to matters of fact or questions of mere procedure. In re Dill. 32 Kansas, 668.

In the present case there was a refusal to answer questions propounded in open court during the trial of a cause within the jurisdiction of the Circuit Court to hear and determine, and the refusal was placed upon the ground that the answers to the questions would tend to criminate the party to whom the questions were propounded. If, under the circumstances disclosed by the record, the party questioned had a clear constitutional or legal right to insist on his privilege not to answer the questions on the ground stated, it would be illegal to adjudge him in contempt for refusing to answer, and hence it becomes necessary for us to see if such right of privilege as claimed in the Circuit

Court did exist as a matter of law.  The ground of the
refusal to answer the questions propounded was that
the answers thereto would tend to criminate the peti-
tioner, and what we have to say in this opinion will be
confined to such ground of privilege.

It is an ancient maxim of the law that no man shall
be compelled to criminate himself.  The origin and
necessity of this maxim, as others of the common
law, grew out of conditions found in the early history
of English jurisprudence in reference to the adminis-
tration of criminal law, and which, it must be ad-
mitted, evince many traces of cruelty and barbarity.
There was a time when suspected persons were not
only deprived of an opportunity to have witnesses
produced in their favor, and of the advice and aid of
counsel, but were put to torture for the purpose of ex-
torting from them confessions of guilt, or statements
which could be used in securing their convictions.
Securing the conviction of even suspected persons by
such means, justly became odious, and we find the
humanity of the common law proclaiming that no man
shall be compelled to criminate himself—*nemo tenetur
se ipsum prodere.*   This principle of the common law
was fully recognized in this country when the formation
of governments began, and we find it imbedded in the
National and all the State Constitutions that we have
examined.   In our Constitution it is found in the
twelfth section of the Bill of Rights, that "no person
shall be subject to be twice put in jeopardy for the
same offense, nor compelled in any criminal case to be
a witness against himself, nor be deprived of life,
liberty or property without due process of law; nor
shall private property be taken without just compen-
sation."   The provision, that no person shall be com-
pelled in any criminal case to be a witness against

himself, should be broadly and liberally construed to secure the protection designed to be accomplished by it, and to this end no technical limitation should be placed upon the terms employed. The terms "in any criminal case" might on casual reading be taken to confine the protection against self-accusation to investigations in criminal cases, but such is not the true meaning. Our constitutional provision is the same as those found in the constitutions of the United States and of the State of New York, as well as other States, and the cases of Counselman vs. Hitchcock, 142 U. S. 547, 12 Sup. Ct. Rep. 195, Book 35 Co-op. ed. 1110, and People *ex rel.* Taylor vs. Forbes, 143 N. Y. 219, 38 N. E. Rep. 305, clearly demonstrate that a broad and liberal construction of such provisions should obtain in furtherance of the right sought to be secured. In the first case cited it is said that the privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard. "The object was to insure that a person should not be compelled, when acting as a witness in an investigation, to give testimony which might tend to show that he himself had committed a crime." In the New York case, after stating that the matter had frequently been adjudicated both in the Federal and State courts, the following language is used, *viz:* "The principle established by these decisions is that no one shall be compelled in any judicial or other proceeding against himself, or upon the trial of issues between others, to disclose facts or circumstances that can be used against him as admissions tending to prove his guilt or connection with any criminal offense of which he may then or afterwards be charged, or the sources from which or the means by which evidence of its commis-

sion, or of his connection with it, may be obtained."
A witness is exempt by his privilege from answering
not only what will criminate him directly, but also
what has any tendency to criminate him, the reason
being, as stated by Phillips on Evidence, vol. 2, p.
929, "because otherwise question might be put after
question, and though no single question may be asked
which directly criminates, yet enough might be got
from him by successive questions whereon to found
against him a criminal charge." In showing the ex-
tent of the immunity which a witness is entitled to
claim, the following language used by Chief-Justice
Marshall, on the trial of Aaron Burr, has often been
quoted, *viz:* "Many links frequently compose that
chain of testimony which is necessary to convict an
individual of a crime. It appears to the court to be
the true sense of the rule that no witness is compelled
to furnish any one of them against himself. It is cer-
tainly not only a possible, but a probable, case that a
witness by disclosing a single fact may complete the
testimony against himself, and to a very effectual pur-
pose accuse himself as entirely as he would by stating
every circumstance which would be required for his
conviction. That fact of itself would be unavailing,
but all other facts without it would be insufficient.
While that remains concealed in his own bosom he is
safe, but draw it from thence and he is exposed to a
prosecution. The rule that declares that no man is
compellable to accuse himself would most obviously
be infringed by compelling a witness to disclose a fact
of this description."

The authorities agree that the right of privilege
against compelling disclosure of incriminatory evi-
dence is personal to the witness, he alone being en-
titled to invoke its protection, and that it may be

waived by him.   Whether the court or the witness has
the right to determine the question of privilege, or to
what extent the claim of privilege is left to the deter-
mination of the witness, has not been so uniformly
stated in the decisions.   It has never been recognized
that he alone has the right in all cases to decide
whether his answer will tend to criminate him.   Such
a rule would be mischievous and enable unscrupulous
witnesses to defeat the ends of justice in many cases.
The privilege must be claimed in good faith, and not
as a shield to defeat justice.   It was held in Regina
vs. Boyes, 1 B. & S. 311, that to entitle a witness to
the privilege of silence "the court must see from the
circumstances of the case and the nature of the evi-
dence which he is called to give, that there is reason-
able ground to apprehend danger to the witness from
his being compelled to answer.   Moreover the danger
to be apprehended must be real and appreciable with
reference to the ordinary operations of law in the
ordinary course of things."   The New York court, in
People vs. Mather, 4 Wend. 229, stated the right of
privilege to be that when the witness "claimed to be
excused from answering the court are to determine
whether the answer he may give to the question can
criminate him directly, or indirectly, by furnishing
evidence of his guilt, or by establishing one of many
facts, which together may constitute a chain of testi-
mony sufficient to warrant his conviction, but which
one fact of itself could not produce such result, and
if they think the answer *may* in any way criminate
him, they must allow his privilege, without exacting
from him to explain how he would be criminated by
the answer which the truth may oblige him to give."
To require the witness to explain how his answer would
criminate him would, of course, expose him to the

very danger against which the privilege was designed to protect him. In People *ex rel*. Taylor vs. Forbes. *supra*, it is said that "the weight of authority seems to be in favor of the rule that the witness may be compelled to answer when he contumaciously refuses, or when it is perfectly clear and plain that he is mistaken, and that the answer could not injure him, or tend in any degree to subject him to the peril of prosecution. But the courts have recognized the impossibility in most cases of anticipating the effect of the answer. Where it is not so perfectly evident and manifest that the answer called for can not incriminate, as to pre-clude all reasonable doubt or fair argument, the privilege must be recognized and protected." While the witness must judge of the effect of his answer, and should not be required to explain how it will criminate him, yet the court must determine under all the circumstances of the case whether such will be its tendency from the question asked, and where from the nature of the investigation and the character of the testimony sought, it reasonably appears that the answer may criminate or tend to criminate, the witness has the right to claim his privilege, and is not bound to answer. State vs. Duffy, 15 Iowa, 425; Kirschner vs. State, 9 Wis. 140; Chamberlain vs. Wilson, 12 Vt. 491, S. C. 36 Am. Dec. 356; *Ex parte* Boscowitz, 84 Ala. 463, 4 South. Rep. 279.

As stated above, the witness may waive his privi-lege, but to what extent he is held to waive it by consenting to answer some questions, or at what stage of an examination he must insist on his privilege in order to avoid a waiver, is a matter in reference to which there is some considerable confusion in the application of the rule to the various cases. Mr. Phillips, in referring to the early decisions in England, says, in

substance, that from the nature of the right a witness by consenting to answer some questions ought not to be barred from the right of objecting to others, but that he should not be allowed, by any arbitrary use of his privilege, to make a partial statement of facts to the prejudice of either party. And upon this principle it was ruled in Dixon vs. Vale, 1 Car. & P. 278, and East vs. Chapman, 2 Car. & P. 570, that if a witness waive his privilege so far as to answer part of the questions tending to subject him to an indictment, he can not be exempted from answering the remainder, but must give the whole truth. He further states that a majority of the Judges, in Regina vs. Garbett, 2 Car. & Kir. 474, S. C. 1 Dennison's Cr. Cas. 236, thought that it made no difference to the right of the witness to protection, that he answered in part, but that he was entitled to it at whatever stage of the inquiry he chose to claim it, and that they did not consider themselves bound by the cases cited. 2 Phillips on Evidence, 935. Garbett's case was decided in 1847, and the question arose in a criminal prosecution against the accused upon the introduction, on the part of the Crown, of his testimony on a cross-examination in a civil suit. The accused had gone a long way in his testimony towards opening up the matter in reference to which he was being prosecuted, but he refused to answer some questions pointing directly to his guilt and frequently put himself in the hands of the court for protection. The testimony was rejected in the criminal case, and several of the most eminent judges dissented. In the later editions of Greenleaf, the ruling in Garbett's case is adopted. 1 Greenleaf on Evidence, section 451.

The American rule, following to some extent the early English cases, is said to be the other way, and that if a witness discloses a part of a transaction or

conversation tending to criminate him, he waives his privilege and must answer freely, and disclose the whole transaction or conversation, unless the partial disclosure is made under an innocent mistake, or does not clearly relate to the transaction as to which he refuses to testify. In Low vs. Mitchell, 18 Maine, 372, it was held that if the witness consents to testify to one matter tending to criminate himself, he must testify in all respects relating to that matter, so far as material to the issue; that if he waives the privilege, he does so fully in relation to that act, but he does not thereby waive his privilege of refusing to reveal other unlawful acts, wholly unconnected with the act of which he has spoken, even though they may be material to the issue.

It seems to us that it is a just and correct rule that if a witness, with full knowledge of his rights, consents to testify about the very matter that may criminate him, without claiming his privilege, he must submit to a full, legitimate cross-examination in reference thereto. Otherwise a witness would have it in his power to make a partial statement of a matter to the detriment of one party without any adequate means of relief. The following authorities bear on the subject: Foster vs. Pierce, 11 Cush. 437, S. C. 59 Am. Dec. 152; Commonwealth vs. Price, 10 Gray, 472, S. C. 71 Am. Dec. 668; Commonwealth vs. Pratt, 126 Mass. 462; Commonwealth vs. Trider, 143 Mass. 180, 9 N. E. Rep. 510; State vs. K., 4 N. H. 562; Amherst vs. Hollis, 9 N. H. 107; State vs. Foster, 23 N. H. 348, S. C. 55 Am. Dec. 191; Coburn vs. Odell, 30 N. H. 540; Chamberlain vs. Wilson, 12 Vt. 491, S. C. 36 Am. Dec. 356; Norfolk vs. Gaylord, 28 Conn. 309; People vs. Freshour, 55 Cal. 375; State vs. Nichols, 29 Minn. 357; Foster vs. People, 18 Mich. 266; Lombard vs. May-

berry, 24 Neb. 674, 40 N. W. Rep. 271; 2 Phillips on Evidence, p. 929 *et seq.*

In Counselman's case, *supra,* he was examined before a grand jury, and in reply to questions stated that he was a grain dealer, and had shipments of grain over certain lines of railroad. When interrogated as to rates of freight secured less than the tariff or open rate, and as to rebates, he refused to answer. While freely admitting that he received freights over certain lines he stated that he did not recollect of shipping over other lines mentioned. It was not insisted on the part of the government that the witness had waived his privilege by answering some questions, and the court makes no reference to this matter in its opinion, but, as the party was discharged, it is evident that the court did not consider he had waived his privilege. The privilege claimed in the case of People *ex rel.* Taylor vs. Forbes, *supra,* was also in an examination before a grand jury when the conduct of students at Cornell University was being investigated. The witness, who was a student, answered that he had no connection whatever with the transaction being investigated, but when questioned as to particular facts connected with it, he claimed his privilege and refused to answer. The court was of the opinion that the witness by answering the general questions as to his connection with the affairs, whether his answers were true or false, did not waive his right to remain silent when it was sought to draw from him some fact or circumstance which in his judgment might form another link in the chain of facts, capable of being used under any circumstances to his detriment. Under the peculiar surroundings of that investigation it presented a case, in the judgment of the court, where the witness might claim his privilege as to collateral circumstances

that tended to imperil him. The question presented in Amherst vs. Hollis, *supra*, was whether or not a certain person was a pauper, and therefore a charge upon a town. The witness stated that he was destitute of property during the time for which the charge was made, and upon further inquiry admitted that he had considerable money three or four years previously, but that the money had gone to adjust matters which he could not disclose without exposing himself to criminal prosecution. After admitting the rule that a witness should not be compelled to criminate himself, and observing that there were cases in which a witness could not be heard to relate a part of a transaction, and refuse to disclose the rest, the court held that the testimony sought to be elicited, although not entirely independent of the facts the witness had testified about, was so far distinct that he was authorized to claim the privilege. The court said that "when asked, in the first place, if he was destitute of property, there is no obvious propriety in his alleging that he could not disclose that without subjecting himself to a prosecution. If he had gone on to speak in part of the disposition that had been made of his property, it might have presented a different case." The cases present illustrations of witnesses testifying in part without being fully advised of their danger and right of privilege, and of the allowance of the privilege by the court after the witness was informed on the subject. The court should inform the witness of his rights when the circumstances of the case call for it, and there are instances where the privilege has been allowed after the witness had spoken, when it was evident that he had spoken in ignorance of his rights, and in such cases all the testimony, as to which a full

examination could not be allowed, may be stricken out.

There is also, it appears, a distinction between the case of a witness proper and an accomplice or a party in interest. An accomplice admits his guilt and seeks to implicate others, and it is not apparent why he should claim immunity from exposure about the very matter which he is willing to confess. As to distinct collateral matters it may be different. When a party in interest volunteers to testify in his own behalf, the rule seems to be not so liberal in his favor as in the case of a disinterested witness who is summoned to testify in controversies between others. Statutes have been passed in several of the States, as was done here at the last session of the Legislature, permitting defendants to testify in their own behalf, and under such statutes, when the defendant elects to testify, the question arises as to the extent he must submit to a full cross-examination. Statutes have also been enacted in several States providing that witnesses shall be required to testify in certain cases, and when they do so, that their statements shall not be used against them in any subsequent prosecution. There is a review of the decisions under such statutes in Counselman's case. We have no statute on the subject, so far as the present case is concerned. All we know of the proceeding in which the claim of privilege was insisted on in the present case is, that petitioner was called and examined as a witness for the respondent in a *quo warranto* case involving the right to the office of Mayor of the city of Pensacola under the recent election held for that purpose on the 4th of June last. The petitioner, after being fully advised of his rights, testified that he voted for respondent in the *quo warranto* case, and that his ballot was received by

the inspectors. It is not questioned here, and we must assume it to be the fact, that the testimony voluntarily given by the witness was admissible and material in the case. The office of Mayor of the city of Pensacola is elective, and the election held in June, 1895, was conducted under the general law governing State elections existing at the last State election. Section 2787 Rev. Stat. provides that "whoever casts knowingly an illegal vote at any election in this State held according to law, shall be punished by imprisonment in the State prison not exceeding six months, or by fine not exceeding one hundred dollars." The provisions of this statute are broad enough to cover illegal voting at municipal elections, and one who knowingly cast an illegal vote at the election in question would be subject to the penalties of the statute. No question is made of this in the present case, nor is it doubted that a voter at said election when called on to testify as to voting would be entitled to the privilege of silence if his testimony would tend to bring upon him the penalties of the statute. State ex rel. Hopkins vs. Olin, 23 Wis. 309. The petitioner, then, was not compelled to state whether he voted at all at the election in question, if his answers would tend to criminate him, but, after being duly advised by the court, he voluntarily stated that he voted and for whom he voted. This statement, in the absence of any other showing, tended to establish the fact of a valid vote for the party for whom the ballot was cast, and it also included the principal or essential criminating charge against the voter, if he, as a matter of fact, had knowingly voted when he did not possess the requisite qualifications. Whether or not the vote was legal and entitled to be counted depended upon prescribed qualifications of the voter, and we are of the

opinion that a proper application of the rule demands that the petitioner should answer the questions touching his qualifications as a voter after he had willingly stated that he had voted at the election. It is a just and reasonable requirement that a witness shall not be allowed, by an arbitrary use of his privilege, to make a partial statement of facts to the prejudice of either party to the suit. It is stated in State ex rel. Hopkins vs. Olin, *supra*, that a person who has voted at an election is always considered as a party when the result of the election is in controversy, and from this standpoint the rule as to subjecting interested parties to a full cross-examination would have more or less effect.

The strongest authority relied on for petitioner is the decision in Counselman's case, but we think there is a clear distinction between that case and the present one. The matter testified about by Counselman—shipping of grain over railroads—was not criminal, nor did it contain any elements of criminality. The crime consisted in paying a less freight than the tariff or open rate, and when asked about this matter he refused to disclose anything about it. He stopped on the border of the criminating matter, and the case presented no ground of waiver of privilege as to such matter. The distinction is sharply drawn in the pauper case from New Hampshire. If petitioner was not a qualified person to vote at the city election, the crime of illegal voting was consummated in the act of casting his ballot, which is the principal criminating act, and having gone into this matter with full knowledge, he should state the matters tending to develop his qualifications as a voter.

Our conclusion is, that the petitioner should be remanded to the custody of the sheriff of Escambia county. Order to be entered accordingly.