66 So.3d 866 (2011)
Thomas William RIGTERINK, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-2162.
Supreme Court of Florida.
June 16, 2011.
*870 David R. Parry of Bauer, Crider, Pellegrino, and Parry, Clearwater, FL, for Appellant.
Pamela Jo Bondi, Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Thomas William Rigterink appeals his convictions for first-degree murder and sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons provided in our analysis, we affirm Rigterink's convictions of first-degree murder and sentences of death.
The most critical and dispositive issue in this case involves the denial of a motion to suppress statements that Rigterink contends were improperly obtained after police administered a Miranda[1] warning, which Rigterink asserts was materially deficient. Rigterink contends that the police, before beginning a custodial interrogation, failed to properly advise him that he had the right to counsel both before and during the custodial interrogation. See Rigterink v. State (Rigterink I), 2 So.3d 221, 234 (Fla.2009). Although this Court previously reversed his conviction in Rigterink v. State (Rigterink I), 2 So.3d 221, 254-55 (Fla.2009), the case upon which this Court relied on as controllingState v. Powell (Powell I), 998 So.2d 531 (Fla.2008)was overturned by the United States Supreme Court in Florida v. Powell (Powell II), ___ U.S. ___, 130 S.Ct. 1195, 1206, 175 L.Ed.2d 1009 (2010). Thereafter, the United States Supreme Court granted certiorari review of Rigterink I, vacated the judgment in that case, and remanded for further consideration in light of Powell II. See Florida v. Rigterink (Rigterink II), ___ U.S. ___, 130 S.Ct. 1235, 176 L.Ed.2d 175 (2010). That remand is now the subject of this appeal.
In light of Powell II, we reverse our prior decision in Rigterink I and affirm Rigterink's convictions. We also address and affirm all other non-Miranda claims Rigterink raised during his initial appeal to this Court.

Facts
This Court's previous decision in Rigterink I provided a well-articulated factual predicate for Rigterink's murder conviction. That predicate is as follows:

I. BACKGROUND
This case involves the stabbing and murder of Jeremy Jarvis and Allison Sousa, which occurred in a in a dual-use warehouse complex in Polk County, Florida, on September 24, 2003. After an investigation by the Polk County Sheriff's Office ("PCSO"), Rigterink was indicted for these offenses on November 4, 2003.
On September 9, 2005, the jury found Rigterink guilty as to each count of first-degree *871 murder. Following the penalty phase, the jury recommended a death sentence for each murder through two seven-to-five votes. The trial court later held a hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993).[n.2] At the ensuing sentencing hearing, which was held on October 14, 2005, the trial court adopted the jury's death recommendations. With regard to the murder of victim Jarvis, the trial court found the following aggravators:
(1) Rigterink's prior conviction of another capital felony or a felony involving the use or threat of violence to a person (i.e., the contemporaneous murder of victim Sousa) (great weight); [n.3] and
(2) The murder of victim Jarvis was especially heinous, atrocious, or cruel ("HAC") (great weight). [n.4]
[N.2] At the Spencer hearing, defense counsel presented a motion to appoint Dr. David McCraney as a psychological expert and to delay sentencing for the purpose of evaluating Rigterink through neurological and neuropsychological testing. Previously, Rigterink had undergone psychological examinations with Drs. Thomas McClane and Tracy Hartig. The trial court denied this motion because defense counsel could not provide a factual basis other than their observation that Rigterink displayed an unusual, off-putting lack of emotion during his trial. Further, the court found that defense counsel had not complied with Florida Rule of Criminal Procedure 3.202.
[N.3] § 921.141(5)(b), Fla. Stat. (2003).
[N.4] § 921.141(5)(h), Fla. Stat. (2003).
With regard to the murder of victim Sousa, the trial court found the following aggravators:
(1) Rigterink's prior conviction of another capital felony or a felony involving the use or threat of violence to a person (i.e., the contemporaneous murder of victim Jarvis) (great weight);
(2) Rigterink murdered victim Sousa to avoid or prevent a lawful arrest (great weight); [n.5] and
(3) HAC (great weight).
[N.5] § 921.141(5)(e), Fla. Stat. (2003).
The trial court found one statutory mitigatorno significant history of prior criminal activity [n.6]but only assigned this mitigation "some weight" because of Rigterink's admissions that he has: (a) used illegal drugs, primarily marijuana, since his late teens; (b) stolen from his former employer; and (c) driven with a suspended driver's license. The trial court also found and considered twelve nonstatutory mitigators. [n.7] Rigterink later filed a timely notice of appeal with this Court.
[N.6] § 921.141(6)(a), Fla. Stat. (2003).
[N.7] (1) use of drugs (little weight); (2) reputation with family and friends as a peaceful person (some weight); (3) kindness and attention to maternal and paternal grandmothers (some weight); (4) desire to help other prison inmates (some weight); (5) religious commitment while in prison (some weight); (6) assisted turtles across roadways (little weight); (7) supportive family (moderate weight); (8) capable of kindness (some weight); (9) one credit hour remaining to obtain bachelor of science degree in biology (little weight); (10) sympathy for the victims' families (little weight); (11) ability to be educated and to educate others (little weight); and (12) exhibited appropriate courtroom behavior (little weight).
The evidence presented during Rigterink's trial for these offenses revealed the following facts.

A. The Murders of Jeremy Jarvis and Allison Sousa
Shortly after 3:00 p.m. on September 24, 2003, a male in his late twenties to early thirties, who fit the general description of Rigterink, attacked victim Jeremy Jarvis with a ten-to-eleven-inch knife. The attack began inside the warehouse residence of Jarvis, which was located in the fifth unit of the complex, and eventually moved outside. A male eyewitness testified that as he *872 drove past this location, he slowed his vehicle and viewed two menone, an apparent attacker, standing above another, an apparent victim. The victim was lying on the sidewalk immediately in front of one of the building units. The witness's attention was drawn to the men because he saw red or crimson on the victim's clothing. It appeared that the attacker was attempting to drag the victim into the last unit of the building. As the victim struggled to free himself, the attacker grabbed him and tore off his T-shirt. When the victim fled toward the first unit of the complex, the witness observed a significant amount of blood flowing from wounds on his chest. The witness observed the victim approach and open the door of the first unit, while the attackerwho was "about halfway down" the sidewalk at this pointremained in pursuit. According to the witness, the victim was a 5'8" male, in his late twenties to early thirties, between 150 and 200 pounds, with dark brown hair, and the attacker was a 6'0" to 6'3" male in his late 20s to early 30s, between 150 and 200 pounds, with dark brown hair. These general descriptions are consistent with the physical characteristics and appearance of Jarvis and defendant-appellant Rigterink on September 24, 2003. Further, the attacker wore a white T-shirt and dark-colored shorts, which is consistent with the clothing Rigterink later admitted that he wore on the afternoon of September 24.
At the time, units 1 and 2 of this dual-use warehouse complex served as the office of a construction business. A second victim, Allison Sousa, and a female eyewitness were both secretaries at this establishment, and each woman was working on Wednesday, September 24, 2003. That afternoon, Sousa and the female witness heard screaming outside of the construction office. They approached and opened the door of unit 1, and a dirty, sweaty, bloody, and shirtless malewho was later identified as the first victim, Jeremy Jarvisentered the office and sat down in a chair near the door. The female eyewitness testified that Jarvis appeared to be experiencing serious blood loss from a wound on the right side of his chest. The witness remained composed at this point, but Sousa was "more frantic." Sousa began to care for the man and to call 911. She instructed the female witness to go to the office kitchen in the back to obtain some towels to address the obvious injuries that Jarvis had sustained. The witness obeyed, and as she began to return to the front of unit 1, the witness heard the door slam. She continued forward toward a pass-through window located between the main-office and lobby areas. Through this window, the witness observed a second male aggressively approaching Sousa. At this point, Sousa was approximately six feet away from the witness on the other side of the window. The witness saw that Sousa was still attempting to call 911, and she also caught a glimpse of the second man's profile and a side view of his body. At trial, she described him as a white male, early-to-late twenties, with dark hair, wearing a long white T-shirt and dark shorts, about 6'3", 170 pounds, with an olive or tan complexion, and no facial hair or hair on his forearms. With the possible exception of the hairless forearms, this description is consistent with Rigterink's appearance on September 24, 2003. The witness could not see whether the second man had anything in his hands, but she felt that he was "going after" Sousa and that he had seen her (the witness) approach the window. For that reason, the witness fled to an office located further toward the rear of unit 1. As the witness ran, she heard *873 Sousa scream, "Don't hurt me. Don't hurt me." When the witness reached the rear office, she closed the door, locked the deadbolt, and dialed 911.
The PCSO received two 911 calls from this location on September 24, 2003. The dispatcher received Sousa's call at 3:07:37 p.m. and received the female eyewitness's call at 3:07:46 p.m. The recording of the first call reveals:
911 Operator: "911. What's your emergency? Hello?"
911 Caller: "Oh, my God. Don'tdon't hurt me. No. . . ."
The dispatcher then heard "people. . . throwing something around" and afterward total silence. The line remained open for four minutes. During the second 911 call, the female witness told the dispatcher that an injured man entered her office and that another man was then in the process of breaking in and attempting to hurt her coworker, Allison Sousa. The caller further stated that at least one of the men had been stabbed and she feared that something terrible was happening to Sousa. The witness later requested an ambulance, and she provided a consistent description of the attacker: He was wearing a white T-shirt, dark shorts and was probably over six feet tall. The dispatcher remained on the line for several minutes with the witness until PCSO deputies arrived and the dispatcher confirmed their identities. At trial, the female eyewitness testified that during the 911 call, she heard scuffling, banging, and impacts against the walls within unit 1. She later heard someone rub against the walls and attempt to gain access to the rear office in which she was hiding. She only opened the door and emerged from the office once PCSO deputies had arrived and secured the crime scene. After exiting unit 1, the witness provided a contemporaneous statement to PCSO investigators in which she described the attacker as a white male between 6'0" and 6'2", 160-170 pounds, tanned skin, black wavy hair, no facial hair, and wearing a light-colored T-shirt with dark shorts.
When PCSO personnel arrived, they secured the entire complex and discovered the lifeless bodies of Jarvis and Sousa in the rear-warehouse area of unit 1. PCSO crime-scene technicians ("CSTs"), and later three blood-spatter technicians from the Florida Department of Law Enforcement ("FDLE"), processed the collective crime scene for the next several days. During the guilt and penalty phases of Rigterink's subsequent trial for these murders, the medical examiners established that the attacker stabbed or cut Jarvis a total of twenty-two times and stabbed or cut Sousa a total of six times. Both victims had several injuries to their hands and limbs that were consistent with defensive wounds. Of the twenty-two wounds inflicted upon Jarvis, four were fatal: three to his right lung, which led to its eventual collapse and internal and external bleeding; and one to his abdomen, which penetrated his stomach and produced internal and external bleeding. Of the six wounds sustained by Sousa, two were fatal: one just above her left breast, which completely severed her pulmonary trunk, a major blood vessel; and one to her to abdomen, which struck and damaged her liver. Both of Sousa's fatal wounds led to large amounts of internal bleeding.
Inside unit 1 (the office of Sousa's employer), the CSTs encountered abundant evidence of a bloody, vicious attack. Both sides of the entry door to unit 1 were smeared with blood. There was a large pool of blood near the entrance, as if someone had been standing or sitting there while bleeding heavily, which is consistent with testimony that Jarvis sat *874 in a chair near the entrance while Sousa attempted to dial 911. The CSTs also found a blood-smeared gumball dispenser in the lobby, which was overturned, separated from its base, and surrounded by apparent vomit. The heavy blood stains on the walls and doors of unit 1 were consistent with someone forcefully pushing anotherwho was bleeding profuselyagainst these surfaces. There were also numerous blood-spatter cast-off arcs, which were consistent with the attacker using a bloody knife to repeatedly strike the victims. Further, the pass-through window and the entire hallway leading through unit 1 were smeared with blood. In the main-office area, there was a large pool of blood under a desk as if one of the victims had sought refuge there. A phone on top of the desk was off the hook and dangling from its cord just above the floor. A veritable trail of blood continued down the hallway into the kitchen area, where large amounts of blood were smeared on a refrigerator, a trash bin, and some of the cabinets. Continuing along this trail of blood toward the rear of the unit, the door between the rear-office and warehouse areas had been damaged along with its locking mechanism and frame. This damage was consistent with someone attempting to charge or crash through the door to gain access to the rear-warehouse area of the construction office. Additionally, there were bloody, smeared palm prints on the door. The blood trail finally ended in the rear-warehouse area near the bodies of Jarvis and Sousa. The medical examiners established that the two victims were conscious for several minutes, were aware of their injuries and experienced intense pain, and eventually bled to death. The victims' wounds were consistent with the attacker stabbing or cutting them with a ten- or eleven-inch blade.
Inside unit 5 (the residence of Jarvis), the CSTs discovered large blood smears on the wall adjacent to the entrywayconsistent with the conclusion that a struggle occurred in that area. Blood also covered much of the flooring. Furniture, including a sofa, was overturned and in disarray. A trail of blood droplets led from unit 5 along the sidewalk to the entrance of unit 1. FDLE personnel developed two bloody latent fingerprints on the inside of the door to unit 5, which were later determined to match Rigterink's relevant print patterns. Fingerprint analyst Patricia Newton testified that the photographs of these prints recorded their unique pattern and that the prints were consistent with the print-donor's fingers having already been covered in blood and the donor then touching the door, rather than the surface of the door having blood on it with the print-donor merely touching the freshly deposited blood. At various locations hidden inside unit 5 (e.g., under the overturned sofa, under Jarvis's mattress, and inside a laundry hamper), the CSTs found three to five pounds of marijuana with a street value of several thousand dollars. Additionally, the CSTs recovered $429 from Jarvis's right-front pocket. Jarvis's mobile phone was the final significant item of evidence that the PCSO discovered in unit 5. Detective Jerry Connolly, the lead detective on this case, and other PCSO investigators eventually used this phone, and associated phone records, to compile a list of Jarvis's known associates, whom PCSO investigators viewed as the primary leads to solving this case.

B. The Resulting Murder Investigation
Using the call log on Jarvis's mobile phone, along with the phone records that the PCSO later obtained from Jarvis' *875 service provider, Detective Connolly and his colleagues began to establish contact with Jarvis's known associates. One of the first associates that they contacted was Marshall Mark Mullins. Either late during the night of September 24, 2003, or the early morning of September 25, Detective Connolly and a group of PCSO detectives, including Det. Scott Rench, contacted Mullins at his home. The detectives roused Mullins and questioned him with regard to his whereabouts during the afternoon of September 24, 2003. Mullins provided a complete alibi. He explained that he worked for R & R Heating and Cooling and that during the afternoon of September 24, 2003, he had been completing an HVAC installation at a residence in Lake Wales. Mullins also stated that his employerthe owner of R & Rwas with him the entire time. Later, during the day on September 25, 2003, Detective Connolly confirmed this alibi with both the employer and the Lake Wales homeowner. The employer also produced an invoice corroborating that he and Mullins completed the Lake Wales project on September 24, 2003.
During Mullins' recorded statements to PCSO investigators, he never implicated himself in the Jarvis-Sousa murders in any way. Moreover, Mullins' fingerprints did not match any of the bloody latent prints obtained from the crime scene. According to the testimony of Rigterink's former girlfriend, Rigterink received a voicemail message from Mullins sometime during the evening of September 24, 2003. On the tape, Mullins said, "Tom, this is your buddy, Mark. I think our buddy, Jeremy [Jarvis], has been shot." Later, during April of 2004, Mullins was killed in an automobile accident. Since Mullins appeared to be a fruitless lead, the PCSO detectives moved on to other known associates of Jarvis. One of those associates was Rigterink.
At approximately 11:30 a.m. on the morning of September 25, 2003 (the day following the murders), two detectives from the PCSO cold-case squad, who had been assigned to assist in the Jarvis-Sousa murder investigation, went to Rigterink's condominium ("condo") and knocked on the door. They were interested in this location because of phone calls between a phone located at this address and Jarvis's mobile phone, which occurred on the day of the murders. A dog barked, but no one responded to the door. The detectives could not see anyone through the doors or windows of the residence. The only vehicle that the detectives observed at the condo was a Jeep registered to Rigterink. The detectives parked their unmarked car in a position some 200 feet away from the condo where they could observe the front of the building. From that location, they conducted surveillance for several hours. They did not observe any vehicles or persons approach or exit the front of the condo.
While they waited outside, the detectives contacted Rigterink's parents, who agreed to bring him to his condo for an interview. Rigterink arrived at 7:30 p.m. and invited the detectives inside. At approximately 7:45 p.m., two additional detectives (Ivan Navarro and Tracy Smith) arrived to question Rigterink. Rigterink explained that on the previous day, September 24, 2003, he had been in class at Warner Southern College from 8 a.m. until noon. After Rigterink returned home, he called Jarvis to purchase some marijuana. He also stated that sometime after 2 p.m., he had another phone conversation with Jarvis concerning the same topic. Rigterink explained that during this second call, Jarvis told Rigterink that he was on his *876 way to Lakeland to pick up a new batch of marijuana. As part of this questioning, Rigterink volunteered the names of three additional known associates of Jarvisincluding Marshall Mark Mullinswho were also allegedly involved in the drug trade. Rigterink was calm and collected during the entire interview. He did not exhibit any signs of fear or anxiety, nor did he react with any apparent emotion to the news that his friend or acquaintance, Jeremy Jarvis, had been murdered. Further, Rigterink specifically denied that he had any personal, face-to-face contact with Jarvis on the day of the murders. As part of this visit, Rigterink provided consent for the police to search his Jeep and to "look around" his condo. None of the detectives observed any cuts or injuries to Rigterink's person on September 25.
PCSO investigators next made contact with Rigterink on October 9, 2003. By this time, the PCSOwith FDLE assistancehad been able to obtain suitable photographs of the bloody latent prints recovered from the front door of unit 5, and they were in the process of obtaining "elimination prints" from all known associates of Jarvis to rule them out as suspects in the ongoing murder investigation. On October 9, Detective Connolly spoke with Rigterink in his condo. The two men discussed Rigterink's dealings with Jarvis in regard to purchasing marijuana and the timeframe during which Rigterink had placed the phone calls to Jarvis on the day of the murders. Rigterink agreed to visit the PCSO the next day, October 10, 2003, to provide "elimination prints," but never appeared for that appointment.
At 4:30 p.m. on October 10, Rigterink called Detective Connolly to explain that he would not be able to provide his fingerprints that day due to a lack of transportation. As an alternative, Rigterink offered to appear the following Monday, October 13, 2003. Rigterink also failed to appear on the 13th; instead, he took his former girlfriend to the beach. On October 14 and 15, the PCSO investigators were unable to establish contact with Rigterink at his condo or through his friends and family. During the evening of October 14, 2003, Rigterink's former girlfriend used her key to enter Rigterink's condo to feed his dog. Inside, she discovered that Rigterink had barricaded himself inside his bathroom. She was frightened because she thought that Rigterink was dead or that something awful had happened to him. Rigterink and his former girlfriend then traveled to her home, went for a ride in her car, and had a conversation during which Rigterink explained to her that everything was going to be fine. Later that night, Rigterink's former girlfriend dropped him off at his parents' home. At trial, Rigterink testified that he then decided to hide on his parents' roof:
The house is such that there are solar panels on the flat part of the roof over . . . the porch . . . and it's basically like a tent, and that's where I hid. And . . . I figured . . . no one would think to look up there. I would be safe, and I could sort of watch who came and went at their house.
While on the roof, Rigterink saw the PCSO investigators come and go on October 15, 2003. During this time, the PCSO obtained an executed consent-search form to impound and search a 1992 blue Toyota pickup that belonged to Rigterink's father. Using a chemical called Luminol, the CSTs later discovered blood near the driver-side door, armrest, seatbelt and seatbelt assembly, steering wheel and column, and the passenger-side floorboard area. At trial, Rigterink admitted that he borrowed his father's blue Toyota pickup on Monday, *877 September 22, 2003, and that he continued driving the truck until Wednesday, September 24, 2003. The PCSO investigators were not aware of this information at the time, but the blood found inside the truck was genetically consistent with that of Jarvis. According to the relevant FBI DNA database, the frequency occurrence of the driver-side door sample was 32 quadrillion to one in the Caucasian population. The frequency occurrence of one of the seatbelt samples produced the same statistical probability. The remaining samples were consistent with mixtures of Rigterink's and Jarvis's blood, but excluded Sousa as a possible donor. [n.10]
[N.10] Additionally, the PCSO could not exclude Rigterink as the source of the foreign DNA discovered under Jarvis's fingernails.
On the morning of October 16, 2003, from his perch on the roof, Rigterink saw his mother, Nancy, who appeared to be distressed. Rigterink descended from the roof to comfort her. At approximately 10 a.m. on the 16th, Nancy called Detective Connolly and explained that Rigterink was ready to speak with the PCSO investigators. When Detective Connolly and other investigators arrived, Rigterink had just finished a shower and, while he dressed, Rigterink told Detective Connolly that two men from Lake Wales who sold "ice" (i.e., methamphetamines) might have murdered Jarvis and Sousa. After some discussion, Rigterink agreed to accompany the police to the PCSO Bureau of Criminal Investigations ("BCI") to provide "elimination prints." Rigterink was driven by his parents to the BCI office.
After Rigterink provided "elimination prints," he was interviewed by a group of PCSO detectives. Following several hours of questioningwhich included repeated accusations of dissembling and the disclosure that Rigterink's fingerprints matched those discovered in blood at the crime sceneRigterink eventually admitted in a videotaped statement that (1) he traveled to the dual-use warehouse complex on September 24, 2003, to purchase marijuana from Jarvis; (2) he struggled with Jarvis while holding a large knife, but did not recall stabbing anyone; (3) he pursued Jarvis into unit 1; (4) he recalled certain aspects of these events, but his memories appeared as disjointed "Polaroid snapshots"; (5) he eventually discovered Sousa's body and "freaked out"; and (6) in the midst of "hauling ass" away from the warehouse complex, he disposed of the bloody knife and a black Jansport backpackwhich contained his bloody clothingby throwing these items off of a bridge. At the conclusion of this interrogation, PCSO personnel arrested Rigterink for the murders of Jarvis and Sousa.

C. Rigterink's Confession and Trial Testimony

i. Attempted Suppression
On August 20, 2004, before Rigterink's eventual trial for these murders, he moved to suppress all statements that he made during the videotaped portion of his October 16, 2003, confession. Rigterink contended that these statements should be suppressed because the written and verbal Miranda warnings provided by the PCSO detectives were materially defective. Specifically, Rigterink challenged the verbal and written right-to-counsel warnings he received because each advised him that he only had "the right to have an attorney present prior to questioning." (Emphasis supplied.) The initial trial judge and a successor trial judge each denied the motion to suppress on the ground that Rigterink was not in custody and, therefore, was not entitled to any Miranda *878 warnings. Rigterink also objected to the admission and publication of the videotaped confession at trial, which the court overruled.
In total, the October 16 police interview or interrogation continued for over four hours as Rigterink remained in the same small room. However, the unrecorded portion of the interrogation, which was not challenged, covered from approximately 11 a.m. until 2:24 p.m. (roughly 3.5 hours). During the suppression hearing, Rigterink contended that while he initially traveled to the BCI office voluntarily to provide "elimination prints" and to speak with the PCSO investigators, the interrogation became custodial when the police (1) confronted him with tangible, circumstantial evidence of his guilt and repeatedly accused him of lying, and (2) read him his rights pursuant to Miranda.

ii. The Unrecorded, Unchallenged Portion of the InterrogationRigterink's First, Second, and Third Stories
The non-taped portion of the October 16, 2003, interview or interrogation constituted the majority of the police questioning and, again, has not been challenged below or on appeal. During the suppression hearing, Detective Connolly was the only witness to testify on behalf of either party. Connolly testified that after attempting to reach Rigterink from October 9, 2003, until October 15, 2003, the PCSO investigators were finally able to reestablish contact with him in order to obtain his "elimination prints."
While the police were waiting for fingerprint analysts to compare Rigterink's fingerprints to the bloody latent prints discovered at the crime scene, Rigterink was taken to a six-by-eight, sound-insulated interrogation room, which contained three chairs and a small desk. Initially, Detectives Connolly, Rench, and Raczynski were all inside this small room with Rigterink. [n.13] Connolly testified that the interrogation-room door was closed but not locked. PCSO personnel instructed Rigterink's parents to remain waiting in the lobby. Rigterink was not handcuffed or restrained during the interrogation.
[N.13] During the interrogation, there were at least two detectives in the room with Rigterink at all times.
During the unrecorded portions of the interrogation, Rigterink provided three irreconcilable stories in response to repeated accusations from the detectives that he was lying with regard to his activities and whereabouts on the day of the murders. First, Rigterink claimed that he called Jarvis to establish a marijuana deal on September 24, 2003 (the day of the murders), but he never actually went to Jarvis's home that day. At the conclusion of his first story, the detectives accused Rigterink of lying. In response, Rigterink offered a different version of the facts: He traveled to Jarvis's home on the day of the murders, completed a purchase of marijuana, and left at a time when Jarvis was alone and unharmed. At the conclusion of Rigterink's second story, the detectives again stated that he was lying and that he was somehow involved with these murders.
The detectives finally decided to confront Rigterink with the fact that two of his fingerprints matched the bloody latent prints recovered from the crime scene. After being confronted with the fingerprint match, Rigterink provided a still different version of the facts. In this third rendition, Rigterink stated that he arrived after the murders occurred. Specifically, he claimed that when he approached unit 5, he saw blood smeared over the entryway. Rigterink then walked inside unit 5 and "touched *879 everything" in the process of looking for Jarvis. He was unable to find Jarvis in unit 5, so he exited. Once outside, he noticed a blood trail leading from unit 5 to unit 1, so he followed the trail until he arrived at unit 1. He entered unit 1 and observed a large amount of blood and two people lying on the floor. Rigterink then approached the bodies and checked both of their pulses. He could not find a pulse on either victim. At this point, Rigterink realized that he was covered in blood and became scared, so he fled and drove home. Rigterink could not explain why he was covered in blood. He did not call 911 because he was frightened. Rigterink estimated that he spent only five minutes at the crime scene.
At the conclusion of his third story, the detectives again accused Rigterink of lying with regard to his involvement in these murders. Rigterink then replied that he would tell the detectives "the whole truth." Detective Connolly testified that Rigterink was responsive and alert throughout this process. It was only after Rigterink had agreed to "tell the whole truth," that Detective Connolly verbally advised him of his Miranda rights and requested that he read and sign a rights-waiver form to ensure the admissibility of his confession. As further explained in our analysis, both the verbal and written explanations of Rigterink's "Fifth Amendment" right to counsel were defective based on our decision in State v. Powell, 998 So.2d 531 (Fla.2008), because these explanations only stated that Rigterink had a right to counsel "prior to" questioning. Once Rigterink was read his Miranda rightswhich included a defective explanation of his right to counselDetective Connolly turned on a hidden recording device and microphone located within the interview room.

iii. The Recorded, Challenged Portion of the InterrogationRigterink's Fourth Story [n.14]
[N.14] Rigterink's videotaped confession was not admitted into evidence or considered during the suppression hearing; rather, it was placed in evidence during Rigterink's trial. Therefore, the presentation under this heading is a more complete version of events than that presented by the State during the suppression hearing. Our later analysis contains the facts that we consider with regard to whether Rigterink was in custody for Miranda purposes.
Rigterink challenges only the admissibility of the recorded portion of his lengthy October 16, 2003, interrogation. The interrogation continued for approximately 3.5 hours before Rigterink received Miranda warnings. During the recording of Rigterink's confession, which was entered into evidence as State's exhibit 462, Rigterink first claimed that he was suffering from a case of food poisoning during the morning of September 24, 2003. He awoke at around 7 a.m. and called Jarvis at approximately noon. The call was "[a]bout hooking up. And [Jarvis] said he had to go to Lakeland, he'd try to get there fast. And [Rigterink] said, why don't you go ahead and go, and I'll come over after." "Hooking up," meant purchasing marijuana. Rigterink claimed that he later discovered Jarvis was also involved in the methamphetamine trade. At approximately 2:30 p.m. on September 24th, Jarvis returned Rigterink's call and informed him that the marijuana was available. Rigterink then drove his father's blue 1992 Toyota pickup to the warehouse complex. That day, Rigterink was wearing "[b]lack shorts and a gray shirt and tennis shoes" and a floppy desert-camouflage hat.
When Rigterink traveled to Jarvis's home on the 24th, he carried a black *880 Jansport backpack in which he placed a black hunting knife with a ten- or eleven-inch blade that began straight but curved toward its tip. Rigterink also carried an off-white Nike T-shirt inside this backpack, which he planned to wear later that afternoon. At that point, Rigterink had owned the knife for approximately ten years. When Rigterink arrived at the complex, he parked immediately outside unit 5. Rigterink was unaccompanied and he explained to the detectives that he always carried a bag with him to Jarvis's home to conceal his marijuana purchases. Jarvis's front door was partially open, but Rigterink knocked nonetheless, and Jarvis allowed him to enter. Rigterink and Jarvis did not consume any drugs or alcohol during this visit. However, Rigterink claimed that he was still somewhat ill from his case of food poisoning.
Rigterink described the remaining events through a series of five "Polaroid snapshots." Once he entered unit 5, he and Jarvis spoke briefly about the new batch of marijuana, and then Jarvis began to reach under his sofa to retrieve something. This is the last thing that Rigterink remembered before being "locked up" in a struggle with Jarvis near the front door of unit 5. In the midst of the interrogation, Rigterink offered to draw a diagram to accompany his verbal and physical descriptions of these events. This diagram was eventually entered into evidence as State's exhibit 466. As part of the first "Polaroid snapshot," Rigterink stated that he saw himself "locked up" with Jarvis and perceived that he had the hunting knife in his hand and that he was covered in blood. Rigterink claimed that he did not realize that Jarvis had been stabbed until they both exited unit 5, and Jarvis pulled off his T-shirt, thereby exposing his wounds.
When they moved outside, Rigterink saw himself standing, while Jarvis was kneeling, which is consistent with the testimony of the male eyewitness presented at trial. Rigterink could not remember if he was attempting to help or harm Jarvis. Rigterink then recalled a second "Polaroid snapshot":
I remember being there. I can tell you exactly the position we were in. . . . And I remember I was holding onto him. I don't know if I had the knife in my hand because I thought I had him with two hands, but I know I still had the knife in my hand, holding onto him. And the next thing I rememberI don'tI don't remember at all. . . . [A]nd in any event, the next thing I remember is running. I think I was right behind him.
He then transitioned to a third "Polaroid snapshot," this time within unit 1: "And the . . . next image I have is [Jarvis] swinging a bubble gum dispenser at me." Rigterink claimed that he was not bruised or cut the next day, but he felt as though he had sprained his wrist. He agreed that his sprain might have been from the "jarring" of the knife. Rigterink then recalled a fourth "Polaroid snapshot": He ran down a long hallway in unit 1 and "jumped into" or "ran through" the doorway separating the rear-office area from the warehouse area. Rigterink said that he may have injured his wrist by hitting the door.
Rigterink then segued into his fifth "Polaroid snapshot": "And the last thing I remember is looking at the girl [Allison Sousa]. I didn't even see Jeremy [Jarvis] in the back room. And then I hauled ass." Rigterink claimed that he checked Sousa's pulse. He did not know if she had one because he was "freaked out." Rigterink was emphatic that he did not remember stabbing either victim. He did not remember seeing Jarvis *881 after the third "Polaroid snapshot." When asked about the issue of paying for the marijuana that day, Rigterink claimed that Jarvis was simply going to give him the marijuana free of charge.
After these events, Rigterink claimed that he removed his bloody shirt and ran back into unit 1 to retrieve the backpack before leaving. Rigterink then opined to the interrogating detectives that he had self-diagnosed potential psychological problems. He did not remember any type of argument with Jarvis; rather, he claimed that he simply "blacked out." He stated that on at least two prior occasions he had blacked out and severely beaten others: once in Miami and once in Tampa. For a time, he consulted a drug-rehabilitation therapistJulie Dantzlerbut he was "above her head." He suggested that his conduct was related to his self-diagnosed mental-health problems.
Rigterink then described his drive away from the crime scene: "I remember being at [a traffic] light and looking down and being covered in blood." When Rigterink looked down and discovered that he was covered in blood, he thought "[w]hat the f*ck happened." At that moment, he determined that it would be best to get rid of the knife and the backpack because they were "obviously evidence at that time that something had happened." Rigterink claimed that he threw the knife and the black backpack over a bridge that he crossed on his way home (despite searching, the PCSO never recovered these evidentiary items). The knife and the backpack had been lying on the passenger-side floorboard of the Toyota pickup, which explains the blood that the CSTs later found in that area of the vehicle.
Once he returned home, Rigterink took a shower but he did not remember if he cleaned the Toyota pickup. With the exception of his shorts and tennis shoes, all of the clothing that he wore during the attacks was in the black Jansport backpack that he threw over the bridge. Therefore, on the following day, Thursday, September 25, 2003, he washed his shorts and shoes and placed them in a Tupperware bin in his closet. He later placed these shoes and shorts in the garbage, which was picked up on the following day, September 26, 2003 (this later action roughly coincided with the PCSO detectives' first visit to Rigterink's condo).
After cleaning up on the 24th, Rigterink took his dog with him to his parents' home. The following exchange between Detective Raczynski is indicative of the type of response Rigterink offered with regard to why he did not render aid or call 911:
Raczynski: So after you left and you realize what you had done[,] did you think to maybe call somebody to make sure that [Jarvis and Sousa] were okay or what were you thinking?
Rigterink: No thought process at all. . . . Everything was all . . . black. After the fact it was a blur. I don't remember individual actions I took or places I went or people I talked to.
Rigterink claimed that by "[t]hat Friday[, September 26, 2003,] I knew that I'd done it. . . . I don't remember the event but I knew what had happened." Rigterink stated that he did not discuss the killings with anyone or tell anyone what he had done.
After this information was obtained, at approximately 5:30 p.m., Detective Connolly called an assistant state attorney to ensure that he had probable cause to arrest Rigterink. Once he had the attorney's approval, Detective Connolly arrested Rigterink and placed him in PCSO custody. Rigterink's parents *882 were still waiting in the lobby at this time, and PCSO personnel then told them that they should return home without their son. Rigterink was 32 years old when he provided his confession and, until his arrest, he was not placed in handcuffs or otherwise restrained.

iv. The Relevant Trial TestimonyRigterink's Fifth Story
During the defense case-in-chief, Rigterink took the stand and testified in what amounted to over nine hours of combined direct, cross, and redirect examination. Through his testimony, he offered a fifth version of the facts with regard to his activities and whereabouts on Wednesday, September 24, 2003. In the process, he contradicted almost everything that he had previously told the police and, instead, claimed that he intentionally misled the PCSO investigators because Marshall Mark Mullins had threatened to kill him, his parents, and his former girlfriend if he mentioned that Mullins or an unnamed group of "others" [n.15] were involved in the murders of Jarvis and Sousa.
[N.15] Rigterink testified that Mullins used the pronoun "we" when issuing the death threats. To Rigterink, this indicated that Mullins might have issued these threats on behalf of a larger group of individuals.
During his testimony at trial, Rigterink again admitted that he was at the crime scene, but claimed that he arrived after an apparent attack, explored unit 5, followed the blood trail to unit 1, and then ran down the hallway in unit 1 where he crashed through the doorway separating the rear-office and warehouse areas. Once inside the warehouse area, he discovered both victims. According to Rigterink, Jarvis was still alive and reached up and grabbed Rigterink's hand and arm and then slumped back to the floor. Rigterink then heard what he thought were car doors slamming shut, so he ran outside. As he exited unit 1, he saw a dirty white van drive away. When the van drove past, Rigterink made eye contact with the driver and a passenger. The driver was a taller white male, while the passenger was a shorter, stockier, shirtless man with tattoos on his upper body. Rigterink also thought that he saw movement in the rear of the van, so (in his mind) there may have been a third person in the vehicle.
In an apparent attempt to explain his unorthodox response to discovering two very bloody murder victims (one of whom was an acquaintance or friend), Rigterink consistently described himself as "freaked out," and explained that he had never encountered this type of situation. He never called 911 and never told anyone about the gory, blood-filled scene that he had discovered because on the 24th he was still "freaked out," and on the 25th, Mullins allegedly visited Rigterink at his condo and issued the death threats.
Under oath, Rigterink denied: (1) owning a black hunting knife; (2) having a bag to transport marijuana; (3) owning a black Jansport backpack; (4) changing his clothes or throwing his clothes away; (5) carrying a knife or attacking either of the victims; (6) injuring his wrist; and (7) ever having been in a fight or struggle. Rigterink further claimed that the detectives suggested many of the details and evidentiary items that he identified and discussed during the interrogation. Rigterink testified that he simply "went along with" what the police wanted to hear. In his mind, if he concocted enough stories, the PCSO detectives would then see through his intentional façade and would conduct a thorough examination, which would exonerate him without requiring him to *883 implicate Marshall Mark Mullins. In the words of Rigterink:
Well, I didn't do it, and I figured they'd be able to tell that I had nothing to do with it. As far as the knife, I never had a knife. I never got in a confrontation with Jeremy. . . . I figured the system would work.
In contrast to his claim that he believed the detectives would simply see though his stories, Rigterink also testified that he wanted to provide enough detail "to make it believable." Further, despite the apparently very real, very serious death threats that Mullins delivered on behalf of himself and a dangerous group of unnamed drug dealers, Rigterink had consistently provided Mullins' name to the investigating detectives when they asked him to identify additional associates of Jarvis who might have information relevant to his murder. In fact, the name "Marshall Mark Mullins" was among the first pieces of information that Rigterink provided to PCSO detectives during their first visit to speak with him on September 25, 2003. Moreover, Rigterink provided Mullins' name to law enforcement on the night of September 25 notwithstanding the fact that he claims Mullins issued the death threats that very morning.
Much of Rigterink's trial testimony was also inconsistent with the testimony of other witnesses. For example, his ex-wife testified that he always kept a large military knife with a curved tip and a ten- or eleven-inch black blade lodged between their mattress and box spring. [n.16] Also, both the male and female eyewitnesses testified that one mannot a group of two or three menpursued Jarvis. An additional concern with Rigterink's testimony involved the amount of time between when the PCSO received the 911 calls (close to 3:08 p.m.) [n.17] and when the first responders arrived on scene (close to 3:18 p.m.), which would have made it difficult for Rigterink to have arrived after the murders occurred and to have then explored units 5 and 1 before "freaking out" and leaving all before law enforcement arrived. Finally, on cross-examination, Rigterink was not able to explain why he never called out to his friend Jarvis when he entered unit 1where the female eyewitness happened to be on the phone with the 911 dispatcheror why he felt compelled to charge down a blood-soaked hallway and crash through a door when, by his own admission, he was not there to render aid and was unsure what had occurred in units 1 and 5.
[N.16] Despite repeated searches, the PCSO was never able to recover this weapon.
[N.17] The female eyewitness also testified that the scuffling and banging in unit 1 continued for approximately one minute while she was on the phone with the 911 dispatcher, which pushes the relevant time ahead to approximately 3:09 p.m.

D. Rigterink's Claims on Appeal
Rigterink's primary claim on appeal is his challenge to the admissibility of the single videotaped account of his activities and whereabouts on September 24, 2003. He does so based on the defective right-to-counsel warning provided by the interrogating detectives. In addition, he raises six other claims: (1) the trial court erred in excluding additional testimony that corroborated Rigterink's testimony concerning the violent nature of the drug trade and Mullins' alleged reputation for violence within this "community"; (2) Florida's capital-sentencing scheme is unconstitutional because the judge rather than the jury determines the sentence and the jury's recommendation need not be unanimous; (3) automatic aggravators should not bar the application of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 *884 (2002), to Florida's capital-sentencing scheme; (4) Florida's standard penalty-phase jury instructions unconstitutionally shift the burden to the defendant to prove that mitigating factors outweigh aggravating factors; (5) Florida's standard penalty-phase jury instructions unconstitutionally denigrate the role of the jury in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (6) death by lethal injection constitutes cruel and unusual punishment.
Rigterink I, 2 So.3d at 227-40 (alterations in original) (some footnotes omitted).
In Rigterink I, this Court held that Rigterink's challenge to the admission of the videotape based on deficient Miranda warnings was the dispositive issue on appeal. See id. at 240, 253-54. The Miranda warnings the police administered to Rigterink were both oral and written. The oral Miranda warning was:
[Police Officer]: Do you hereby understand that one, I have the right to remain silent. Two, anything I can say, can and will be used against me in court. Three, I have the right to have an attorney present prior to questioning. Four, if I cannot afford an attorney, one will be appointed to represent me by the court. Do you understand that?
Rigterink: Sure
(Emphasis added.) Rigterink's signed, written Miranda warning was:
I, Thomas Rigterink, do hereby understand that (1) I have the right to remain silent. (2) Anything I say can and will be used against me in court. (3) I have the right to have an attorney present prior to questioning. (4) If I cannot afford an attorney one will be appointed to represent me by the court.
(Emphasis added.)
This Court initially overturned Rigterink's conviction because we determined that Rigterink's Miranda warnings were materially deficient, and that the presentation of Rigterink's inculpatory statements made after the administration of the Miranda warnings during the custodial interrogation constituted harmful error. See id. at 253-60. This Court, in determining that these Miranda warnings were materially deficient, relied primarily on the previous decision in Powell I. See id. at 254. While relying on Powell I as directly controlling, we held that the warning was materially deficient because, as with the warning in Powell I, the warning the police gave to Rigterink failed to reasonably convey to Rigterink that he had the right to counsel both before and during a custodial interrogation. See id. at 253-54. However, the United States Supreme Court subsequently overturned Powell I, see Powell II, 130 S.Ct. at 1206, and remanded Rigterink I back to this Court for reconsideration in light of that ruling, see Rigterink II, 130 S.Ct. at 1235.

Miranda Analysis

Standard of Review
Because this case involves the review of a trial court's ruling on a motion to suppress, this Court accords a presumption of correctness to the historical facts determined by the trial court. See Miller v. State, 42 So.3d 204, 220 (Fla.2010). However, this Court's review of the trial court's application of the law to the historical facts is de novo, as we "`must independently review [the] mixed questions of law and fact that ultimately determine [the] constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.'" Id. (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)). The State also maintains the burden to establish by a preponderance of the evidence that a confession, given the totality of the circumstances, was freely and voluntarily given. See id.

*885 The Powell Case and the Miranda Warning Administered Therein

Because this Court in Rigterink I relied on Powell I, a brief discussion of the Powell case, and the Miranda warning given by police to the defendant in that case, is helpful.
In Powell, the police arrested the defendant for unlawful possession of a loaded firearm. See Powell II, 130 S.Ct. at 1200. The police transported the defendant to police headquarters where, before questioning him, they read their standard consent and release form, which provided:
You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.
See id. (emphasis added) (quotation marks omitted).
After the police administered this Miranda warning, the defendant acknowledged that he had been informed of his rights, that he understood them, and that he was willing to talk with the officers. See id. The defendant then signed a consent and release form that contained the aforementioned Miranda warnings. See id. After providing his signature, he admitted ownership of the handgun found in the apartment and that he knew that he was prohibited from possessing a gun because he was a convicted felon. See id.
The State charged the defendant with unlawful possession of a firearm. See id. Before trial, he moved to suppress the inculpatory statements he made to the police. See id. The defendant argued that the trial court should suppress the statements because the Miranda warning was deficient due to its failure to inform him of his right to the presence of counsel during questioning. See id. The trial court denied the motion, and the jury convicted the defendant of the gun-possession charge. See id.
The Second District Court of Appeal reversed the trial court's decision. See id. In doing so, it held that the Miranda warning did not adequately inform the defendant that he had the right to counsel during the custodial interrogation. See id. This Court accepted review of that decision as a matter of great public importance. See id.
In this Court's Powell decision, we noted the requirements of both the Fifth Amendment, as explained in Miranda, and the Florida Constitution, as explained in Traylor v. State, 596 So.2d 957 (Fla.1992). See Powell I, 998 So.2d at 537-38. We held that our prior explanation in Traylor of the federal and state requirements included the requirement that a suspect be informed of the right to have counsel present during questioning. See id. at 538. After examining the content of the Miranda warning administered to the defendant, we found that the warning was "misleading" because "there is nothing in that statement that suggests the attorney can be present during the actual questioning." Id. at 541. We further held that the last statement of the warningi.e., the "catch-all" phrasedid not effectively convey to the defendant that he had the right to counsel both before and during police questioning. See id. Instead, this court found that the defendant "should have been clearly informed of his right to the presence of counsel during the custodial interrogation," and that the "catch-all phrase did not supply the missing warning of the right to have counsel present during police questioning because a right that has *886 never been expressed cannot be reiterated." Id. (emphasis added).
The United States Supreme Court granted certiorari review of this Court's Powell decision. Before examining the sufficiency of the Miranda warning given in Powell I, the High Court examined whether this Court based its decision on an independent and adequate state-law ground. See Powell II, 130 S.Ct. at 1201. Although much of Powell I "invok[ed] Florida's Constitution and precedent in addition to [the United States Supreme Court's] decisions," the United States Supreme Court concluded that Powell I was based on an interpretation of federal Miranda law and not on an independent and adequate state-law ground. Id. at 1202. It based its decision on the postulate that Powell I did not "indicate[] clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent [state] grounds." Id. at 1203 (alteration in original) (quoting Michigan v. Long, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).
The United States Supreme Court then reviewed the Miranda warning at issue under federal Miranda law. See id. at 1203. It held that Miranda requires that police advise a suspect that he has the right to counsel both before and during a custodial interrogation. See id. It stated, "In determining whether police officers adequately conveyed warnings . . . reviewing courts are not required to examine the words employed `as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by Miranda.'" Id. at 1204 (alterations in original) (some internal quotation marks omitted) (quoting Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989)). The High Court then reasoned:
The Florida Supreme Court found the warning misleading because it believed the temporal languagethat Powell could "talk to a lawyer before answering any of [the officers'] questions"suggested Powell could consult with an attorney only before the interrogation started. In context, however, the term "before" merely conveyed when Powell's right to an attorney became effectivenamely, before he answered any questions at all. Nothing in the words used indicated that counsel's presence would be restricted after the questioning commenced. Instead, the warning communicated that the right to counsel carried forward to and through the interrogation: Powell could seek his attorney's advice before responding to "any of [the officers'] questions" and "at any time. . . during th[e] interview." Although the warnings were not the clearest possible formulation of Miranda's right-to-counsel advisement, they were sufficiently comprehensive and comprehensible when given a commonsense reading.
Id. at 1205 (alterations in original) (citations omitted).
The United States Supreme Court vacated this Court's decision in Powell I and remanded for further proceedings consistent with its opinion. See id. at 1206. The United States Supreme Court then granted certiorari review of this Court's decision in Rigterink I, vacated this Court's judgment in that case, and remanded for further consideration in light of its decision in Powell II. See Rigterink II, 130 S.Ct. at 1235.

The Validity of Rigterink's Miranda Warnings
After examining the requirements of Miranda and its progeny, along with the decision in Powell II, we determine that the Miranda warning the police issued to Rigterink was sufficient. The warning *887 was sufficient and not materially deficient under Miranda and its progeny because it reasonably conveyed to Rigterink that he had the right to counsel both before and during his custodial interrogation. This right to counsel emanates from the right against self-incrimination encompassed in both the Federal and Florida Constitutions.
The Fifth Amendment of the United States Constitution and Article I, section 9, of the Florida Constitution both provide a right against self-incrimination. See U.S. Const. amend. V (stating that no person "shall be compelled in any criminal case to be a witness against himself"); art. I, § 9, Fla. Const. ("No person shall be . . . compelled in any criminal matter to be a witness against oneself."). This Court has clearly outlined and delineated the historical and independent Florida right against self-incrimination as it exists under the Florida Constitution, and determined police must advise citizens that they have the right to counsel both before and during a custodial interrogation. See Traylor v. State, 596 So.2d 957, 965-66 (Fla.1992). However, this Court has interpreted the parameters of the manner in which that right is explained conterminously with the decision in Miranda and its progeny, and, as with the requirements under Miranda, we require that police reasonably convey to a suspect that he or she has the right to counsel both before and during a custodial interrogation. See, e.g., Miller, 42 So.3d at 221 ("Based on this Court's analysis of Florida law and the `experience under Miranda and its progeny,' we outlined the [] rights that police officers must convey to a Florida suspect prior to a custodial interrogation to ensure the voluntariness of a confession. . . ." (quoting Traylor, 596 So.2d at 966)).
The warnings in this case reasonably conveyed to Rigterink his right to counsel because, given the context in which the police administered the Miranda warnings, the warnings provided a clear, understandable instruction that Rigterink had the right to counsel both before and during a custodial interrogation. This is in accord with the decision in Powell II because, there, the United States Supreme Court deemed a Miranda warning proper and sufficient that conveyed the right to counsel in language with no greater clarity than the language used in the warnings administered to Rigterink. Thus, because the warning in Powell II satisfied the parameters of Miranda and its progeny by reasonably conveying knowledge of the right to counsel both before and during a custodial interrogation, we conclude that, logically, the clearer and more descriptive warning administered to Rigterink in this case also complies with the requirements of Miranda and its progeny.

i. The right against self-incrimination in the Federal and Florida Constitutions
The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Under this clause, an individual has a due process right to not be compelled to make a statement that would incriminate him in a criminal proceeding. See Miranda v. Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (citing Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). This right extends to custodial interrogations, and it establishes a due process right to have counsel present during such an interrogation. See id. at 466, 86 S.Ct. 1602. The presence of counsel during a custodial interrogation is needed because it is "the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]." Id. By having counsel present, a suspect is guarded *888 against the inherently coercive nature of an interrogation and assured that his or her statements obtained during an interrogation are freely and voluntarily given. See id. at 467, 86 S.Ct. 1602 ("[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."). More precisely, the presence of counsel "insure[s] that statements made in the government-established atmosphere are not the product of compulsion." Id. at 466, 86 S.Ct. 1602; see also Sapp v. State, 690 So.2d 581, 584 (Fla. 1997) ("These rights, commonly known as Miranda rights, are designed to protect an individual's Fifth Amendment right against compelled self-incrimination by offsetting the `inherently compelling pressures' of custodial interrogation." (quoting Miranda, 384 U.S. at 467, 86 S.Ct. 1602)).
However, "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." Arizona v. Evans, 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (emphasis added) (citing Michigan v. Long, 463 U.S. 1032, 1038-40, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). Nothing in the United States Supreme Court's decisional law "trenches on the Florida Supreme Court's authority to impose, based on the State's Constitution, any additional protections against coerced confessions it deems appropriate." Powell II, 130 S.Ct. at 1203 (emphasis added). In fact, in accordance with our federalist system of governance, article I, section 9, of the Florida Constitution "may place more rigorous restraints on government intrusion than the federal charter imposes; [it] may not, however, place more restrictions on the fundamental rights of [Florida] citizens than the federal Constitution permits." Traylor, 596 So.2d at 961. And, "[w]hen called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our State Constitution." Id. at 962.
Therefore, for a Florida court to admit a confession, "the confession[] must pass muster under both the state and federal constitutions. . . . [A court must] examine the confessions initially under our state Constitution; only if they pass muster here need we re-examine them under federal law." Id. at 961. That is because "[i]n any given state, the federal Constitution thus represents the floor for basic freedoms; the state constitution, the ceiling." Id. at 962.
"The common law principles governing confessions and other self-incriminating statements have long been matters of constitutional import in Florida," with the Florida Supreme Court having long ago defined the "basic contours of Florida confession law." Id. at 964. This Court defined the tenets of Florida confession law "[a]s early as 1896," when it emphasized the importance "`of the advice and aid of counsel'" in helping prevent "`torture [of suspects] for the purpose of extorting from them confessions of guilt, or statements which could be used in securing their conviction.'" Id. at 964-65 (quoting Ex parte Senior, 37 Fla. 1, 19 So. 652, 654 (1896)). To determine whether a confession was not coerced and is admissible, "[t]he test [in Florida] is one of voluntariness, or free will, which is to be determined by an examination of the totality of the circumstances surrounding the confession." Id. at 964.
Found within Florida confession law is a right against self-incrimination, which arises from article I, section 9, of the Florida Constitution. See id. That section, as with its federal counterpart in the *889 Fifth Amendment, protects an individual's right not to make incriminating statements. See art. I, § 9, Fla. Const. It provides that "[n]o person shall be . . . compelled in any criminal matter to be a witness against oneself." Id.
To meet the intended purpose of the protection against self-incrimination found in Florida confession law, this Court has broadly and independently construed the protections against self-incrimination provided by article I, section 9. See Traylor, 596 So.2d at 965 (citing Senior, 19 So. at 654) ("[W]e conclude[] that in order for this constitutional privilege to accomplish its intended purpose it must be broadly construed."). This broad and independent construction is embodied and explained in this Court's decision in Traylor.
In Traylor, this Court construed article I, section 9, and the safeguards allocated to an individual's right against self-incrimination under the Florida Constitution by that section. See id. at 964-66. It interpreted article I, section 9, to require that prior to a custodial interrogation, police must inform a suspect that he has "a right to a lawyer's help," id. at 966, which includes the presence of the lawyer both before and during questioning, see id. at 966 n. 13. The decision of the Court provided:
Based on the foregoing analysis of our Florida law and the experience under Miranda and its progeny, we hold that to ensure the voluntariness of confessions, the Self-Incrimination Clause of Article I, Section 9, Florida Constitution, requires that prior to custodial interrogation in Florida suspects must be told that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer's help, and that if they cannot pay for a lawyer one will be appointed to help them.
Id. at 965-66 (emphasis added) (footnotes omitted).
In footnote thirteen of that decision, this Court stated that the right to the help of a lawyer "means that the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation." Id. n. 13 (emphasis added). This Court noted that the "prime purpose" of this rule is "to maintain a bright-line standard for police interrogation," with "any statement obtained in contravention of th[is] guideline[] violat[ing] the Florida Constitution." Id. at 966. Thus, as interpreted in Traylor, under the protection against self-incrimination provided by article I, section 9, a suspect has the right to counsel's assistance during a custodial interrogation, which encompasses having counsel present both before and during the interrogation.
However, this Court in Traylor defined how police should articulate those rights to a suspect conterminously with Miranda and its progeny as it existed at that time. See Traylor, 596 So.2d at 965-66 (basing the way in which Florida courts are to convey the right to counsel on "Florida law and the experience under Miranda and its progeny"). This Court has continued to follow that interpretation set forth in Traylor. See, e.g., Miller, 42 So.3d at 220-22 (stating that this Court derived how police are to administer the rights in article I, section 9, in its Traylor decision).
In fact, in interpreting the parameters of the manner in which Miranda warnings are administered, this Court has explicitly held that "[t]hough our analysis in Traylor was grounded in the Florida Constitution, our conclusions were no different than those set forth in prior holdings of the United States Supreme Court." State v. Owen, 696 So.2d 715, 719 (Fla.1997). Accordingly, although article I, section 9, delineates a right against self-incrimination *890 that provides Florida citizens with an independent right to counsel before and during a custodial interrogation, the parameters of the manner in which police are required to advise a suspect of that right in Florida follows the dictates of Miranda and its progeny as they existed at the time of this Court's decision in Traylor.

ii. The warnings in this case satisfy the dictates of Miranda and its progeny
To protect the individual right against self-incrimination, the United States Supreme Courtin Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)outlined procedural parameters that police must employ with a suspect before and during a custodial interrogation. The Miranda court summarized those parameters as follows:
[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned [1] that he has a right to remain silent, [2] that any statement he does make may be used as evidence against him, and [3] that he has a right to the presence of an attorney, [4] either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.
Id. at 444-45, 86 S.Ct. 1602 (footnote omitted) (emphasis added).
The Miranda court discussed further the extent of the prophylactic protections afforded by the right against self-incrimination, stating that because "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators . . . the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." Id. at 469-70, 86 S.Ct. 1602 (emphasis added).
"[T]his Court and the United States Supreme Court have stressed that there is no talismanic incantation required to ensure [that Miranda] warnings are sufficiently conveyed." Miller, 42 So.3d at 221. A court does not examine a Miranda warning "as if `construing a will' or `defining the terms of an easement.'" Id. at 222 (quoting Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989)). Rather, "[t]he inquiry is simply *891 whether the warnings reasonably `conve[y] to [a suspect] his rights as required by Miranda.'" Id. (alterations in original) (quoting California v. Prysock, 453 U.S. 355, 361, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)). The "crucial test" for determining whether police gave a proper warning "`is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.'" Id. (quoting Coyote v. United States, 380 F.2d 305, 308 (10th Cir.1967)).
In Powell II, 130 S.Ct. at 1206, for example, the determinative issue was whether the police administered an improper Miranda warning because they failed to explicitly inform the defendant before a custodial interrogation that he had the right to counsel both before and during the interrogation. This Court found the Miranda warning at issue in that case insufficient because it did not include a clear instruction that the defendant had the right to counsel during the interrogation. See Powell I, 998 So.2d at 537-41. The United States Supreme Court, however, affirmed that Miranda warning because it found that the warning reasonably conveyed to the suspect his right to counsel both before and during a custodial interrogation. See Powell II, 130 S.Ct. at 1205. In that case, the police read the suspect his Miranda warning from a form, which stated:
You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.
Id. at 1200 (emphasis added).
In reversing Powell I, the United States Supreme Court found that this warning was proper because it reasonably conveyed to the suspect his right to have counsel present during the interrogation by not entirely omitting any information that Miranda requires the police to convey. See id. at 1204-06. More specifically, the United States Supreme Court found that because the officers told the suspect that he had the "right to talk to a lawyer before answering any of [their] questions" and "the right to use any of [his] rights at any time [he] want[ed] during th[e] interview," the police provided the defendant with the information that Miranda required. Id. at 1204-05 (alterations in original). The Supreme Court admitted that these "warnings were not the clearest possible formulation of Miranda's right-to-counsel advisement," but held that when this warning was given a commonsense reading, it sufficiently conveyed to the defendant that he had the right to counsel both before and during a custodial interrogation. Id. at 1205. Its reasoning was that "[i]n context, . . . the term `before' merely conveyed when [the defendant's] right to an attorney became effectivenamely, before he answered any questions at all." Id. The Court noted that "[n]othing in the words used indicated that counsel's presence would be restricted after the questioning commenced." Id. In fact, the Court decided the opposite, stating "the warning communicated that the right to counsel carried forward to and through the interrogation," conveying to the defendant his ability to "seek his attorney's advice before responding to `any of [the officers'] questions' and `at any time . . . during th[e] interview.'" Id. (alterations in original).
*892 Furthermore, the "catch-all" phrase at the end of the warning in Powell II, when taken in combination with the part of the warning denoting the right to counsel before the custodial interrogation, arguably made the warning sufficient. See id. ("In combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times."). However, the sufficiency of the warning in Powell II did not hinge on the catch-all phrase. Rather, the catch-all phrase merely confirmed that the defendant in Powell II could exercise his right to counsel during the custodial interrogation. See id. (stating that the catch-all phrase "confirmed that [the defendant] could exercise [the right to counsel] while the interrogation was underway"). The statement that the defendant had the right to counsel before the custodial interrogation, when taken alone in context, was sufficient to satisfy Miranda, as it, in and of itself, reasonably conveyed to the defendant that his right to counsel began before the custodial interrogation and logically continued throughout the interrogation. See id. ("In context, however, the term `before' merely conveyed when Powell's right to an attorney became effectivenamely, before he answered any questions at all. Nothing in the words used indicated that counsel's presence would be restricted after the questioning commenced. Instead, the warning communicated that the right to counsel carried forward to and through the interrogation. . . .").
In this case, the Miranda warnings administered to Rigterink by the police were sufficient under Miranda and its progenyespecially when considered in light of Powell IIbecause they reasonably conveyed Rigterink's right to counsel both before and during a custodial interrogation. In Powell II, the police advised the defendant that he had "the right to talk to a lawyer before answering any of [their] questions." Powell II, 130 S.Ct. at 1204 (emphasis added) (alteration in original). Synonymously, Rigterink's warnings provided that Rigterink had "the right to have an attorney present prior to questioning." Rigterink I, 2 So.3d at 234. As with the synonymous warning in Powell II, when Rigterink's warning is given a commonsense reading, it reasonably conveys to a suspect that he or she has the right to the presence of counsel both before and during an interrogation. This is because the use of the word "present," along with the "before" and "prior to," convey to a suspect that his or her right to counsel begins before the custodial interrogation and, as a result, will logically continue during the interrogation. The use of "prior to," like the use of "before" in Powell II, is a mere temporal requirement providing when the right to counsel begins. As with the term "before," nothing in the use of the phrase "prior to" indicates that the right to counsel's presence ends when questioning begins.
Furthermore, when examining the entire context within which the police used the phrases "prior to" and "present," Rigterink's warning is a clearer instruction regarding the right to counsel than the instruction in the warning the police administered in Powell II. This necessitates its validity under Miranda and its progeny, as the Supreme Court held that the warning in Powell II falls within Miranda's parameters, making a Miranda warning that is a more clear conveyance of the right to counsel just as, if not more, sufficient.
The augmented clarity of the Rigterink warning is in the part of the warning that precedes the words "prior to," which is the following phrase: "right to have an attorney present." (Emphasis added.) By placing the language denoting counsel's presence immediately before the "prior to" *893 phrase, the police, when giving the warning a commonsense reading, conveyed to Rigterinkwith more clarity than did the police in Powell IIthat he had the right to not only obtain counsel, but also have the attorney present before the custodial interrogation began, with that presence reasonably expected to continue throughout the duration of the interrogation. It is indefensible that Rigterink believed that the warnings stood for the proposition that he could have counsel present before questioning began and that, once questioning began, counsel must leave. This would have presented both Rigterink and the police with an untenable situation, as the police would have had to cease questioning and allowed counsel to come to and from the room whenever Rigterink sought counsel's advice during questioning. Such a situation would have confounded the purpose of the police advising Rigterink of his right to have counsel present, and it would have spawned an illogical result that neither the police nor Rigterink could have reasonably believed that the warning conveyed. The Court in Powell II, which did not use the word "present," reached a similar logical conclusion, stating:
To reach the opposite conclusion, i.e., that the attorney would not be present throughout the interrogation, the suspect would have to imagine an unlikely scenario: To consult counsel, he would be obliged to exit and reenter the interrogation room between each query. A reasonable suspect in a custodial setting who has just been read his rights, we believe, would not come to the counterintuitive conclusion that he is obligated, or allowed, to hop in and out of the holding area to seek his attorney's advice. Instead, the suspect would likely assume that he must stay put in the interrogation room and that his lawyer would be there with him the entire time.
Powell II, 130 S.Ct. at 1205 (footnotes omitted).
Hence, by advising Rigterink that he may have counsel "present prior to questioning," the police reasonably conveyed to Rigterinkwith more clarity than the police in Powell IIthat counsel, if Rigterink so desired, would have been "present" with Rigterink both before and during the custodial interrogation. Therefore, the right to counsel warning the police administered to Rigterink was sufficient under Miranda and its progeny.

Analysis of Rigterink's Other Claims

Excluded Testimony
Rigterink claims that the trial court abused its discretion by excluding testimony that would have corroborated the violent nature of the drug trade and the death threats that he received from Marshall Mark Mullins. The trial court, however, acted properly in excluding this testimony.
Specifically, during the guilt phase, Rigterink testified with regard to the violent nature of the drug trade and the death threats that he received from Marshall Mark Mullins. To corroborate this testimony, defense counsel attempted to use the testimony of William Farmer. In support of this attempt, Farmer appeared at trial and proffered the following testimony:
 Farmer is originally from Chicago, but has lived in the Lakeland and Winter Haven areas for the past several years. He has been in and out of jail "pretty much" his entire life.
 He provides security, debt-enforcement, and debt-collection services for drug dealers. He has been accused of, and investigated for, at least four homicides.
 He and Marshall Mark Mullins were merely "acquaintances by passing." He has never conducted business with Mullins in the drug trade. He simply *894 knew some of the same people as Mullins.
 He offered his opinion that Mullins was more "off the chain" or aggressive with regard to his collection techniques.
 He denied any role in the Jarvis-Sousa murders, and denied any knowledge with regard to Mullins' alleged involvement with these crimes.
 He does not know Thomas Rigterink.
Farmer did not frame or present any of his testimony in terms of Mullins' "reputation" within the drug-trade "community." Moreover, he never provided any indication of how large or broad-based this supposed community was, or how many people within this "community" shared the same perception of Mullins.
The defense originally presented Farmer's testimony for the purpose of demonstrating that Mullins made statements against his penal interest. However, in response, the trial court granted the State's motion in limine to exclude the testimony of Farmer on the basis that the testimony presented conflicting hearsay that was not sufficiently corroborated to satisfy the applicable admissibility predicate under section 90.804(2)(c), Florida Statutes (2005).[2]
Later during Rigterink's trial, the defense again sought to proffer Farmer's testimony. This time, the defense contended that Farmer's testimony was admissible to show: (a) knowledge of the interaction of individuals involved in the drug trade in the immediate area, and Farmer's knowledge of many of the witnesses that were named in this case; and (b) his knowledge of the reputation of Marshall Mark Mullins. The defense did not provide a new proffer, and the trial court never specifically ruled on this re-proffer of Farmer's prior testimony. This claim by the defense lacked merit and the trial court acted properly in excluding Farmer's testimony.
Assuming relevancy[3] and satisfaction of the predicate requirements, hearsay testimony is admissible to establish one's reputation within his or her community. Section 90.803(21), Florida Statutes (2005), provides:
[T]he following are [admissible] as evidence, even though the declarant is available as a witness: . . . (21) Reputation as to character.Evidence of reputation of a person's character among associates or in the community.
In turn, section 90.405(1), Florida Statutes,[4] as interpreted by this Court, supplies the applicable admissibility predicate:
Section 90.405 governs the type of evidence that may be used to prove reputation. As a predicate to the introduction of such evidence, a foundation must be *895 laid to prove that the witness testifying as to reputation is aware of the person's general reputation for truthfulness in the community. Charles W. Ehrhardt, Florida Evidence § 405.1 (1995 ed). Essentially, it must be established that the community from which the reputation testimony is drawn is sufficiently broad to provide the witness with adequate knowledge to give a reliable assessment. This assessment must be based on more than "mere personal opinion, fleeting encounters, or rumor." Rogers v. State, 511 So.2d 526, 530 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Further, reputation evidence "must be based on discussions among a broad group of people so that it accurately reflects the person's character, rather than the biased opinions or comments of. . . a narrow segment of the community." Ehrhardt, supra, § 405.1 at 197 (footnote omitted).
Larzelere v. State, 676 So.2d 394, 399-400 (Fla.1996).
Farmer's testimony failed to establish the existence of a recognized, broad-based drug-trade "community." Additionally, Farmer presented his testimony with regard to Mullins' allegedly violent nature in terms of his own opinion and generalized personal experiences, which is not a proper method to establish character or reputation evidence in Florida. See, e.g., Wyatt v. State, 578 So.2d 811, 813 (Fla. 3d DCA 1991) (holding that section 90.405, Florida Statutes, "specifically limits the introduction of character evidence to reputation. . . [and] does not permit evidence of character to be made by opinion" (citations omitted)).
Thus, Farmer's testimony concerning Mullins appears to be based on "mere personal opinion, fleeting encounters, or rumor," which this Court has stated is insufficient to satisfy section 90.405(1)'s admissibility predicate. Rogers, 511 So.2d at 526; see also Ibar v. State, 938 So.2d 451, 469 (Fla.2006) ("As a predicate to the introduction of . . . reputation evidence, . . . section 90.405, Florida Statutes (1999), requires the witness to be aware of the person's general reputation in the community and that the community must be sufficiently broad to provide adequate knowledge and a reliable assessment.").
Therefore, the trial court did not abuse its discretion by excluding Farmer's testimony under section 90.405(1).

Constitutionality of Capital Sentencing Scheme and Lethal Injection

a. Ring and the Unanimous Jury Verdict of Guilty
Rigterink alleges that Florida's capital sentencing scheme fails to satisfy the constitutional requirements articulated in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and that Florida's capital sentencing scheme is unconstitutional because the judge, rather than the jury, determines the sentence and the jury's recommendation need not be unanimous. This Court has consistently rejected similar challenges to Florida's capital sentencing scheme, and Rigterink has merely presented his general objections to this Court's prior precedent.
For example, in Frances v. State, 970 So.2d 806, 822 (Fla.2007), this Court addressed the challenges that Rigterink raised in this case concerning Florida's capital sentencing scheme:
[I]n over fifty cases since Ring's release, this Court has rejected similar Ring claims. See Marshall v. Crosby, 911 So.2d 1129, 1134 n. 5 (Fla.2005), cert. denied, 547 U.S. 1143, 126 S.Ct. 2059, 164 L.Ed.2d 807 (2006). As the Court's plurality opinion in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), noted, "the United States Supreme Court repeatedly *896 has reviewed and upheld Florida's capital sentencing statute over the past quarter of a century." Id. at 695 & n. 4 (listing as examples Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)); see also King v. Moore, 831 So.2d 143 (Fla.2002) (denying relief under Ring).
[The defendant's] claim is without merit. Ring did not alter the express exemption in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that prior convictions are exempt from the Sixth Amendment requirements announced in the cases. Id. at 490, 120 S.Ct. 2348. [N.5.] This Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims. See, e.g., Smith v. State, 866 So.2d 51, 68 (Fla.2004) (denying relief on Ring claim and "specifically not[ing] that one of the aggravating factors present in this matter is a prior violent felony conviction"); Davis v. State, 875 So.2d 359, 374 (Fla.2003) ("We have denied relief in direct appeals where there has been a prior violent felony aggravator."); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (stating that the existence of a "prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt"); Henry v. State, 862 So.2d 679, 687 (Fla.2003) (stating in postconviction case that this Court has previously rejected Ring claims "in cases involving the aggravating factor of a previous violent felony conviction").
[N.5.] In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added).
Additionally, this Court has rejected claims that Ring requires the aggravating circumstances to be individually found by a unanimous jury verdict. See Hodges v. State, 885 So.2d 338, 359 nn. 9-10 (Fla.2004); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003); Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003). The Court has also repeatedly rejected challenges to Florida's standard jury instructions based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See Mansfield v. State, 911 So.2d 1160, 1180 (Fla.2005); Sochor v. State, 619 So.2d 285, 291 (Fla. 1993); Turner v. Dugger, 614 So.2d 1075, 1079 (Fla.1992).
In this case, the trial court accepted the jury's death recommendations and found the following aggravators: (1) prior-violent-felony convictions as to each victim (i.e., the contemporaneous conviction for each murder); (2) HAC with regard to each victim; and (3) witness elimination with regard to victim Sousa. Therefore, the court found an indisputable aggravator with regard to each victim, as well as one additional aggravator with regard to victim Jarvis, and two additional aggravators with regard to victim Sousa. During the guilt phase, the jury also unanimously found Rigterink guilty of each first-degree murder, thereby satisfying the mandates of the Federal and Florida Constitutions. See Frances, 970 So.2d at 822; see also Kimbrough v. State, 886 So.2d 965, 984 (Fla.2004); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (each addressing the presence of indisputable aggravators). Accordingly, Rigterink is not entitled to relief on this claim.

*897 b. Burden Shifting

Rigterink filed a pretrial motion[5] directed toward his assertion that Florida's standard penalty-phase jury instructions unconstitutionally shift the burden of proof to the defendant to demonstrate whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances. Rigterink, however, never lodged a contemporaneous objection during the penalty-phase charge conference or at the time the jury was instructed. Therefore, absent fundamental error, this claim has not been preserved for appeal. See, e.g., Walls v. State, 926 So.2d 1156, 1180 (Fla.2006) ("Jury instructions `are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred.'" (quoting State v. Delva, 575 So.2d 643, 644 (Fla.1991)) (emphasis supplied)). Rigterink has not contended that these instructions resulted in fundamental error. Accordingly, he has waived this issue on appeal. See City of Miami v. Steckloff, 111 So.2d 446, 447 (Fla.1959) ("It is an established rule that points covered by a decree of the trial court will not be considered by an appellate court unless they are properly raised and discussed in the briefs.").
Regardless, in light of this Court's prior rulings, instructing the jury in accordance with Florida's standard penalty-phase instructions did not result in error and, consequently, this claim is not reviewable on appeal. See Walls, 926 So.2d at 1180. Time and again, the Court has "rejected the argument that the standard penalty phase jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence." Taylor v. State, 937 So.2d 590, 599 (Fla. 2006) (citing Elledge v. State, 911 So.2d 57, 79 (Fla.2005); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002)). Rigterink is not entitled to relief on this claim.

c. Role of Jury
Rigterink contends that Florida's standard penalty-phase jury instructions unconstitutionally denigrate the role of the jury in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Rigterink filed a pretrial motion[6] in opposition to Florida's standard penalty-phase jury instructions based on Caldwell.
Given this Court's prior rulings in this area, instructing the jury in accordance with Florida's standard penalty-phase instructions did not result in error and, consequently, this claim is without merit. This Court has consistently rejected similar claims. See, e.g., Mansfield, 911 So.2d at 1180; Sochor, 619 So.2d at 291; Turner, 614 So.2d at 1079. Informing the jury that its recommended sentence is "advisory" is a correct statement of Florida law and does not violate Caldwell. See, e.g., Combs v. State, 525 So.2d 853, 855-58 (Fla.1988).

d. Lethal Injection
Rigterink contends that lethal injection constitutes cruel and unusual punishment in violation of the federal Eighth Amendment and article I, section 17 of the Florida Constitution. Rigterink, however, never objected to Florida's lethal-injection protocol below. Moreover, the Governor has not yet signed his death *898 warrant. Therefore, this claim has not been preserved and is not ripe for review on direct appeal. Cf. Harrell v. State, 894 So.2d 935, 941 (Fla.2005) ("As we have noted, the sole exception to the contemporaneous objection requirement is fundamental error." (citing F.B. v. State, 852 So.2d 226, 229 (Fla.2003))).
Further, even if this claim were ripe and reviewable on direct appeal, it would nevertheless lack merit. This Court recently rejected similar contentions in Lightbourne v. McCollum, 969 So.2d 326, 349-53 (Fla.2007), and Schwab v. State, 969 So.2d 318, 321-25 (Fla.2007). Rigterink has not presented any additional testimony or evidence regarding the purported unconstitutionality of Florida's lethal-injection procedures under article I, section 17 of the Florida Constitution or the Eighth Amendment of the U.S. Constitution. Furthermore, Rigterink neither relies on any new evidence concerning the substances injected or its injection procedures, nor does he advance any claims under the United States Supreme Court's decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), in which a majority of the Court upheld the constitutionality of Kentucky's lethal-injection protocol against an Eighth Amendment challenge. As this Court stated in Schwab, "Given the record in Lightbourne and our extensive analysis in our opinion in Lightbourne v. McCollum, we reject the conclusion that lethal injection as applied in Florida is unconstitutional." Schwab, 969 So.2d at 325. Rigterink is not entitled to relief on this claim.

Sufficiency of the Evidence
Rigterink has not raised this issue on appeal. However, "[i]n death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief." Fla. R.App. P. 9.142(a)(6); see also Blake v. State, 972 So.2d 839, 850 (Fla.2007). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999)).
In this case, the evidence is sufficient to affirm Rigterink's convictions of first-degree murder. Rigterink's involvement in these events is revealed in his statements that were read to the jury. Rigterink's bloody fingerprints were found at the scene, and the police found DNA under Jarvis's fingernails that was consistent with Rigterink's DNA. Further, police found blood in Rigterink's truck that was genetically consistent with that of Jarvis. There were also eyewitness descriptions of two men in an altercation outside the warehouse where the bodies were found that were consistent with the physical characteristics and appearances of Rigterink and Jarvis. Moreover, a witness in unit 1 provided a description of Sousa's attacker that was consistent with Rigterink's appearance on the day of the murders, and the clothing Rigterink was wearing on the day of the murders was consistent with the clothing of the person who attacked Sousa and Jarvis. Therefore, we conclude that there was sufficient evidence to support the convictions of first-degree murder.

Proportionality
Despite the fact that Rigterink has not separately presented this issue on appeal, this Court has an independent obligation to ensure that the death penalty is reserved for the most aggravated and least mitigated of murders. See Philmore v. State, 820 So.2d 919, 939 (Fla.2002); see *899 also Fla. R.App. P. 9.142(a)(6). The Court conducts a proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). As part of this inquiry, the Court must consider the totality of circumstances and compare the given case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). This is not a mere numbers game; rather, it is a holistic comparison of the circumstances of the current case with those of prior decisions where the Court has found that the death penalty was a proportionate punishment. See Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990) ("It is not a comparison between the number of aggravating and mitigating circumstances."). The Court must consider the nature of, and the weight given to, the aggravating and mitigating circumstances. For purposes of proportionality review, the Court accepts the jury's recommendation and the trial court's balancing of the aggravating and mitigating circumstances. See Frances, 970 So.2d at 820.
The trial court found the following aggravating circumstances with regard to victim Jarvis: (1) prior violent felony (i.e., the contemporaneous murder of victim Sousa) (great weight);[7] and (2) HAC (great weight).[8] With regard to victim Sousa, in addition to finding the same aggravating circumstances as those that applied to victim Jarvis, the trial court also found that Rigterink murdered Sousa to avoid or prevent a lawful arrest (i.e., witness elimination) (great weight).[9] The trial court found one statutory mitigatorno significant history of prior criminal activity[10]but only assigned this mitigator "some weight" because of Rigterink's admissions that he has previously engaged in unlawful behavior (i.e., using drugs, driving with a suspended license, and stealing from his former employer). The trial court also found the following non-statutory mitigation: (1) use of drugs (little weight); (2) reputation with family and friends as a peaceful person (some weight); (3) kindness and attention to maternal and paternal grandmothers (some weight); (4) desire to help other prison inmates (some weight); (5) religious commitment while in prison (some weight); (6) assisted turtles across roadways (little weight); (7) supportive family (moderate weight); (8) capable of kindness (some weight); (9) one credit hour remaining to obtain bachelor of science degree in biology (little weight); (10) sympathy for the victims' families (little weight); (11) ability to be educated and to educate others (little weight); and (12) exhibited appropriate courtroom behavior (little weight).
This Court has previously determined that the death penalty is a proportionate sentence in cases involving multiple murders and extensive aggravation. See, e.g., Frances, 970 So.2d at 820-22 (death sentence proportionate where: (1) the defendant murdered two victims by "manual and ligature strangulation"; (2) the contemporaneous killing of each victim created corresponding indisputable aggravators (i.e., prior violent felonies); (3) the murders were committed during the course of a robbery; (4) one of the murders was HAC; and (5) the trial court found "the statutory mitigating factor of age and a number of nonstatutory mitigators relating to [the defendant's] history, personality, and conduct and gave `serious weight' to them"); Schoenwetter v. State, 931 So.2d 857, 875-76 (Fla.2006) (death sentence proportionate where: (1) an eighteen-year-old *900 defendant murdered two victims with a kitchen knife; (2) the court found three shared aggravators as to each murder ((i) prior violent felony; (ii) murder committed during a burglary; and (iii) murder committed to avoid arrest); (3) the court found the additional aggravator that one of the victims was under twelve years of age; (4) the court found that the other victim's murder was HAC; and (5) the court found and considered four statutory mitigators and eight non-statutory mitigators). Moreover, here, the court found HAC as to each victim, and this circumstance is among the weightiest aggravators in the statutory scheme and applies in physically and mentally torturous murders which can be exemplified by the infliction of a high degree of pain or utter indifference to or enjoyment of the suffering of another. See Johnson v. State, 969 So.2d 938, 958 (Fla. 2007) (quoting Barnhill v. State, 834 So.2d 836, 849 (Fla.2002)). Finally, the trial court found that "[t]he aggravating circumstances far outweigh the mitigating circumstances. Each of the aggravating factors, standing alone, would be sufficient to outweigh all of the mitigating factors found in this case." (Emphasis added.)
For these reasons, Rigterink's death sentences are proportionate.

Conclusion
In light of the decision in Powell II, we find that the Miranda warnings the police administered to Rigterink were sufficient. We also reject all other claims raised by Rigterink on direct appeal. Accordingly, we reverse our decision in Rigterink I that held the Miranda warnings were materially deficient, and we affirm Rigterink's convictions of first-degree murder and sentences of death.
It is so ordered.
LEWIS, POLSTON, and LABARGA, JJ., concur.
CANADY, C.J., concurs in result with an opinion.
PARIENTE, J., dissents with an opinion, in which PERRY, J., concurs.
QUINCE, J., dissents with an opinion, in which PARIENTE and PERRY, JJ., concur.
CANADY, C.J., concurring in result.
I concur with the decision to affirm Rigterink's convictions and sentences.
On the Miranda[11] issue, Rigterink has conceded in this proceeding on remand from the United States Supreme Court that the warning given to him met the requirements of federal law. He contends that the warning was nonetheless insufficient under the requirements of the Florida Constitution.
Accordingly, we need notand cannot properlynow decide whether the Miranda warning was inadequate under federal law.[12] Based on the argument presented by Rigterink, the question for us to decide is whether a warning which has been conceded to meet federal requirements is nonetheless inadequate under the Florida Constitution.
This Court has never held that a Miranda warning that was sufficient under federal law was insufficient under Florida law. The prohibition in article I, section 9, Florida Constitution, against compelling *901 any person "in any criminal matter to be a witness against oneself" provides no basis for imposing requirements more exacting than those imposed by Miranda and its progeny. The right of access to counsel is the same under Florida law as under federal law. If a warning explaining the right of access to counsel is adequate under federal law, it will necessarily be adequate under Florida law.
I therefore reject Rigterink's argument that Florida law imposes more stringent requirements than the requirements imposed by Miranda and its progeny.
PARIENTE, J., dissenting.
I respectfully dissent. First, I agree with the majority and Justice Quince that under our Florida Constitution, article I, section 9, there is a separate free-standing privilege against self-incrimination that exists independently of the protections granted by the Federal Constitution. While I disagree with the majority and agree with Justice Quince that the warnings in this case violated the Florida Constitution, for the reasons explained below, in my view, the warnings also violated the Federal Constitution and were contrary to United States Supreme Court cases interpreting the requirements for warnings.
The verbal and written right-to-counsel warnings Rigterink received advised him only that he had "the right to have an attorney present prior to questioning." Based on United States Supreme Court controlling precedent, the warnings in this case are defective because they do not "clearly inform[]" the suspect that he had a "right to consult with a lawyer and to have the lawyer with him during interrogation." Florida v. Powell (Powell II), ___ U.S. ___, 130 S.Ct. 1195, 1199, 175 L.Ed.2d 1009 (2010) (emphasis added) (quoting Miranda v. Arizona, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Powell II specifically stands for the proposition that Miranda warnings must "clearly inform[]" the individual that he or she has a "right to consult with a lawyer and to have the lawyer with him during interrogation." Id.
The warnings administered to Rigterink in this case not only failed to advise him that he had a right to the presence of an attorney during questioning, but the warnings omitted the critical catch-all phrase present in Powell IIthat he could invoke the right to consult with a lawyer "at any time . . . during the interview"and thus did not "clearly inform[]" him of the right to have a lawyer present during interrogation. As Justice Ginsburg made clear in her majority opinion in Powell II:
In a pathmarking decision, Miranda v. Arizona, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that an individual must be "clearly informed," prior to custodial questioning, that he has, among other rights, "the right to consult with a lawyer and to have the lawyer with him during interrogation." The question presented in this case is whether advice that a suspect has "the right to talk to a lawyer before answering any of [the law enforcement officers'] questions," and that he can invoke this right "at any time . . . during th[e] interview," satisfies Miranda. We hold that it does.
Id. at 1199-1200.
Further, from a reading of the entire opinion, it is clear that the United States Supreme Court concluded that the warning, in its totality, was not deficient, based upon the presence of the catch-all phrase that the suspect could invoke this right "at any time . . . during the interview," which informed the suspect of his right to a lawyer during interrogation:
The first statement communicated that Powell could consult with a lawyer before answering any particular question, *902 and the second statement confirmed that he could exercise that right while the interrogation was underway. In combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times.

Id. at 1205 (emphasis added).
While acknowledging that the warning was not the "clearest possible formulation of Miranda," the United States Supreme Court looked at the complete warning administered:
In context, however, the term "before" merely conveyed when Powell's right to an attorney became effectivenamely, before he answered any questions at all. Nothing in the words used indicated that counsel's presence would be restricted after the questioning commenced. Instead, the warning communicated that the right to counsel carried forward to and through the interrogation: Powell could seek his attorney's advice before responding to "any of [the officers'] questions" and "at any time . . . during th[e] interview." App. 3 (emphasis added). Although the warnings were not the clearest possible formulation of Miranda's right-to-counsel advisement, they were sufficiently comprehensive and comprehensible when given a commonsense reading.
Id. In other words, the majority opinion in Powell II explained its reliance on the additional phrase "at any time . . . during the interview." While concluding that the warnings were not deficient, the United States Supreme Court pointed out the following:
The standard warnings used by the Federal Bureau of Investigation are exemplary. They provide, in relevant part: "You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning." This advice is admirably informative, but we decline to declare its precise formulation necessary to meet Miranda's requirements. Different words were used in the advice Powell received, but they communicated the same essential message.
Id. at 1206 (citation omitted).
There is no question that the catch-all phrase, determinative of the outcome in Powell II, was missing in the warnings that were administered here and thus the warnings did not meet the minimum requirements of Miranda under the Fifth Amendment. There is absolutely no United States Supreme Court precedent that approves a warning that contains only a statement of a right to a lawyer present prior to questioning.
As we held nearly twenty years ago under article I, section 9, of our state constitution:
[T]o ensure the voluntariness of confessions, the Self-Incrimination Clause of Article I, Section 9, Florida Constitution, requires that prior to custodial interrogation in Florida suspects must be told that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer's help, [n.13] and that if they cannot pay for a lawyer one will be appointed to help them.
[n.13] This means that the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation.
Traylor v. State, 596 So.2d 957, 965-66 & n. 13 (Fla.1992). However, in this case, the majority does not reach the issue as to whether the warnings administered to Rigterink were defective under our state constitution but reviews only whether the warnings meet the minimum requirements under Miranda.
*903 For these reasons, I dissent and, as we did in Rigterink I, I would reverse and remand for a new trial.
PERRY, J., concurs.
QUINCE, J., dissenting.
While I agree with Justice Pariente that the warnings in this case are distinguishable from those reviewed by the United States Supreme Court in Florida v. Powell, ___ U.S. ___, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010) [Powell II], and that the warnings do not satisfy the requirements of the Fifth Amendment, I write separately because I believe that it is not necessary for this Court to reach the federal question to conclude that the warnings are deficient. "When called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein." Traylor v. State, 596 So.2d 957, 962 (Fla.1992). Thus, "we examine the confessions initially under our state Constitution; only if they pass muster here need we re-examine them under federal law." Id. at 961. Because the warnings in this case do not satisfy the requirements of the Florida Constitution, I respectfully dissent.
In Powell II, the Supreme Court acknowledged the primacy of state constitutional protections. Powell argued before the High Court that our decision in State v. Powell, 998 So.2d 531 (Fla.2008) [Powell I], rested on the Florida Constitution, and asserted that regardless of the requirements of federal law, "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." Powell II, 130 S.Ct. at 1203 (quoting Arizona v. Evans, 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995)). The Supreme Court agreed, stating: "Powell is right in this regard. Nothing in our decision today, we emphasize, trenches on the Florida Supreme Court's authority to impose, based on the State's Constitution, any additional protections against coerced confessions it deems appropriate." Id.; see also Oregon v. Hass, 420 U.S. 714, 719, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) ("[A] State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.").
The High Court decided that it was free to address the federal question, however, based on its finding that Powell I did not contain a "clear statement" that the warnings were defective under independent and adequate state law grounds. See Powell II, 130 S.Ct. at 1201-03 (discussing Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)); but see Powell I, 998 So.2d at 542 ("Both Miranda and article I, section 9 of the Florida Constitution require that a suspect be clearly informed of the right to have a lawyer present during questioning."). The Court next held that the warnings given to Powell did not violate the Fifth Amendment and, therefore, reversed our decision in Powell I. Powell II, 130 S.Ct. at 1204-05. Additionally, because our holding in Rigterink v. State, 2 So.3d 221 (Fla.2009) [Rigterink I], was based on Powell I, the Supreme Court similarly vacated our decision in Rigterink I and remanded Rigterink's case to this Court "for further consideration in light of [Powell II]." Florida v. Rigterink, ___ U.S. ___, 130 S.Ct. 1235, 176 L.Ed.2d 175 (2010) [Rigterink II].
On remand, it is our obligation to first determine whether the warnings that were given to Rigterink satisfied the requirements of article I, section 9 of the Florida Constitution; only if the warnings are sufficient *904 under the Florida Constitution do we need to determine whether the warnings violated any requirement of federal law. See Traylor, 596 So.2d at 961. In conducting this review, this Court is not bound by the rulings of the United States Supreme Court concerning the scope and requirements of the Fifth Amendment. We have recognized in prior cases that the privilege granted by the Self-Incrimination Clause of the Florida Constitution, although based in part on "the experience under Miranda and its progeny," id. at 965, is a privilege that exists independently of the protections granted by the federal Constitution. In Traylor, we observed that "[a]s early as 1896, this Court recognized that our common law principles governing confessions are subsumed under the [Florida Constitution's] proscription concerning compelled self-incrimination." Id. at 964.
Further, as we acknowledged in Rigterink I, while "[t]his Court has generally followed federal Fifth Amendment precedent in interpreting article I, section 9 of the Florida Constitution[,] . . . unlike article I, sections 12 (`Searches and seizures') and 17 (`Excessive punishments'), section 9 does not contain a proviso that we must follow federal precedent with regard to the right against self-incrimination." 2 So.3d at 241 (some emphasis added). "Thus, in this context, the federal Constitution sets the floor, not the ceiling, and this Court retains the ability to interpret the right against self-incrimination afforded by the Florida Constitution more broadly than that afforded by its federal counterpart." Id. Indeed, this Court has previously held that the Florida Constitution prohibits the use of certain impeachment evidence that is not barred by the Fifth Amendment. See State v. Hoggins, 718 So.2d 761, 769-70 (Fla.1998) (holding that the use of post-arrest, pre-Miranda silence to impeach a defendant's testimony at trial violates Florida's privilege against self-incrimination); cf. Fletcher v. Weir, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (holding that the use of post-arrest, pre-Miranda silence for impeachment purposes does not violate the federal Constitution).
In Traylor, this Court set out the specific pre-interrogation warnings that are required by the Florida Constitution:
[T]o ensure the voluntariness of confessions, the Self-Incrimination Clause of Article I, Section 9, Florida Constitution, requires that prior to custodial interrogation in Florida suspects must be told that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer's help, and that if they cannot pay for a lawyer one will be appointed to help them.
596 So.2d at 965-66 (footnote omitted). In an accompanying footnote, we clarified that the "right to a lawyer's help," id. at 966, "means that the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation." Id. at 966 n. 13 (emphasis added).
This final warning was clearly absent in this case. In the warnings that were given by the Polk County Sheriff's Office, Rigterink was informed only that he had the right to have counsel present prior to questioning. There was no statement informing him that he had the right have an attorney with him in the room during the interrogation. Moreover, because the warnings did not include the catch-all statement that was given to Powell, this Court errs in relying on the reasoning of Powell II to conclude that the right to have an attorney present during the interrogation was implicit in the warning. See Powell II, 130 S.Ct. at 1205 ("In combination, the two warnings reasonably conveyed Powell's right to have an attorney *905 present, not only at the outset of interrogation, but at all times.") (emphasis added). Accordingly, the warnings did not contain a piece of crucial information that is required by the Florida Constitution. Since we determined in Rigterink I that the appellant was in custody when the warnings were given and that the admission and publication of the videotaped confession was harmful error, the correct result in this case is to reinstate our reversal of the convictions and sentences and to remand for a new trial.
PARIENTE and PERRY, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Section 90.804(2)(c) reads as follows:

A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
(Emphasis added.)
[3] § 90.401, Fla. Stat. (2005) ("Relevant evidence is evidence tending to prove or disprove a material fact.").
[4] Section 90.405(1), Florida Statutes (2005), reads as follows:

Reputation.When evidence of the character of a person or of a trait of that person's character is admissible, proof may be made by testimony about that person's reputation.
[5] On August 22, 2005, at the beginning of the trial proceedings, the defense also renewed all pretrial motions and objections and requested favorable rulings. The trial court denied the defense's motions and overruled its objections.
[6] On August 22, 2005, at the beginning of the trial proceedings, the defense also renewed all pretrial motions and objections and requested favorable rulings. The trial court denied the defense's motions and overruled its objections.
[7] § 921.141(5)(b), Fla. Stat. (2003).
[8] § 921.141(5)(h), Fla. Stat. (2003).
[9] § 921.141(5)(e), Fla. Stat. (2003).
[10] § 921.141(6)(a), Fla. Stat. (2003).
[11] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] When Rigterink raised the federal law issue in the earlier proceedings before this Court, I expressed the dissenting view that the warning was sufficient under federal law. See Rigterink v. State, 2 So.3d 221, 261-62 (Fla.2009) (Canady, J., dissenting).